## MAGNOLIA PIPE LINE CO. v. STATE.

No. A-11588. March 26, 1952.

(243 P. 2d 369.)

Earl A. Brown, Dallas, Tex., Wendell J. Doggett and James E. Horigan, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., James P. Garrett, Asst. Atty. Gen., and Robert J. Nichols, Co. Atty., Stephens County, Duncan, for defendant in error.

POWELL, J. The Magnolia Pipe Line Company, a corporation, was charged by information filed in the county court of Stephens county, with the offense of contaminating water by means of a crude oil pipe line leak. A jury returned a verdict of guilty, and fixed the punishment at a fine of $500. Appeal has been duly perfected to this court.

The charging part of the information reads:

"* * * that Magnolia Pipe Line Company did, in Stephens County, and in the State of Oklahoma, on or about the 27th day of July in the year of our Lord, One Thousand Nine Hundred and Fifty and anterior to the presentment hereof, commit the crime of Contaminating Waters in the manner and form as follows, to-wit:

"That is to say, the said defendant, in the County and State aforesaid, and on the day and year aforesaid, then and there being, did then and there unlawfully contaminate the waters of Mud Creek and Willow Creek, through their contributaries, by allowing crude oil and other deleterious substances to flow from their pumps and pipelines, located on the Dilley Lease, Section 7, Township 3 South, Range 5 West, and certain oils and other deleterious substances flowed in said streams in such manner and in such quantity as to be deleterious and so as to contaminate the waters of said streams and tributaries, * * *."

The charge was filed under authority of Tit. 29 O. S. 1941 § 273, (which now has been supplanted by § 409 of Tit. 29 O. S. 1951, and which in a number of respects materially differs from repealed § 273) reading:

"No person shall deposit, place, throw, or permit to be deposited, placed or thrown, any lime, dynamite, poison, drug, sawdust, crude oil or other deleterious substance, in any of the streams, lakes or ponds of this state, and any person violating the provisions of this section shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, or by imprisonment in the county jail not exceeding one year."

The record of the evidence filed in this court, and which for convenience we shall summarize at this point, shows that in support of the charge the State produced two witnesses.

Thomas M. Sparks, State Game Ranger of Marlow, testified that on or about July 27, 1950, he had occasion to investigate oil going into Willow Creek from the Dilley lease in Stephens county; that Mr. Phil Lowery notified him of such claim; that he went to a tank battery belonging to a Mr. J. G. Beard located about 150 yards west of the section line running south between sections 7 and 8 (Twp. 3 S., R. 5 W.) and found that considerable oil had leaked from a pipe line belonging to defendant; that the leak took place at a point about 50 feet east of the Beard tank batteries: that the 3″ line had been repaired on his arrival; that the oil was on the grass and vegetation and on the creek bank. Witness stated that he did not know what caused the leak except that it was plain that there had been a hole in the pipe line at the point in question. He did not discover that oil had been getting in the creek at any other point at any recent time. Witness estimated that about 24 barrels of oil had escaped.

Witness Sparks took various photographs that were identified and admitted in evidence, and being pictures of the pipe line where the leak occurred, and a picture of the tributary creek from the Dilley lease, showing where it joined Willow Creek three-fourths of a mile from where the leak occurred; also a picture taken from top of the tank batteries showing the course the oil took from defendant's pipe line going down hill to Willow Creek, and finally a fourth picture taken below the Dilley lease showing the amount of oil on the vegetation and in the creek, and that allegedly came from the pipe line leak in question. The pictures showed water in small holes along the intermittent stream.

Witness stated that he notified the Healdton office of the defendant about the oil, and that it was still there about a week or ten days later.

The witness Sparks admitted on cross-examination that there was a steel rod line that crossed the defendant's pipe line at the point where the leak occurred, but stated that he did not know whether the rod line caused the leak or not. Witness was finally asked on re-direct examination: "Q. You observed Willow Creek and Mud Creek? A. I did. Q. You traced this oil from Mud Creek and Willow Creek up to Magnolia's pipe line? A. I did." While these were leading questions by the county attorney, no objections were interposed.

Phil H. Lowery next testified. He stated that he lived at Loco, that at the time of the leak in question he was going down the highway where it was crossed by a little stream and noticed that the water was covered with oil. He traced the oil to near a tank battery of J.G. Beard and discovered that it had been coming out of a pipe line some 50 feet from the tank battery, but the line had then been repaired. He stated that the branch was covered with oil for about one-half mile. He testified that he owned an enjoining pasture that had producing wells on it, and he investigated to see if any of the oil could have come from those or other wells in the area, but it appeared that all the oil came from the leak in defendant's pipe line.

The defendant interposed a demurrer to the evidence, which was by the court overruled.

Roy Spurgin testified for the defendant. He was the pumper for J. G. Beard on the Dilley lease. He stated that Mr. Beard owned a rod line that crossed defendant's pipe line; that at about 5:30 p.m. of July 27, 1950, he drove over to the Dilley lease and discovered the oil spurting out of a hole in the Magnolia

line. That the rod line had fallen from its support and had cut a hole about an inch long and as big around as a pencil; that he shut down the rod line, cut off the flow of oil into the pipe line from the tank owned by his employer Beard; and that the tank gauge showed he had lost 24 barrels of oil.

Witness stated that the next morning he burned the waste oil along the branch. He did not discover any oil in the branch further than 75 yards away. About 10 o'clock the next morning witness notified defendant's gauger Hughes about the leak and told him that he had burned the oil; that it was raining when he called defendant's agent.

On cross-examination witness stated that he was on the Dilley lease twice a week but did not discover that the rod line was wearing into the pipe line because the pipe was embedded in the ground, but later he stated that he had not noticed prior to the discovery of the leak that the rod line was off the stakes that were supposed to keep it off the line. He did not know how it got off, or when.

D. A. Hughes stated that he worked for defendant, that at about 10:00 a.m. on the 25th or 26th day of July, Mr. Spurgin, who worked for J. G. Beard, notified him of the leak in defendant's pipe line and that he got a clamp and made temporary repairs to the line; that he checked and could not find sufficient oil to burn. He estimated that three or five barrels had escaped out of the hole. He stated that it was part of his duty to check defendant's pipe lines; that he normally walked or drove them; that he had been working on the Dilley lease four weeks, but he did not know a rod line crossed the pipe line until after the leak.

John T. McCoy, district field manager for defendant, estimated that it would not require the rod line when off the supports over two or three hours to cut a hole in the pipe line. He stated that the Beard rod line was erected about a year after defendant's pipe line was put in.

C. C. Coffindaffer testified that he was district superintendent for defendant; that between August 7th and 10th the game ranger, Mr. Sparks, notified his office that he was dissatisfied with the way the Dilley lease was cleaned up; that he then took a gang of men and gasolene and spent two days burning oil stains along the bank of the dry branch leading from the Dilley lease to Willow Creek, though they found no oil except for a little on the weeds on the bank.

Herbert Butler, construction foreman, testified to causing the welding of a permanent patch on defendant's pipe line at the place where it had been cut by the Beard rod line, and to supervising the cleaning up of the dry branch.

Clyde Garrett testified to investigating the cause of the leak and finding a hole in the pipe. Witness also took pictures introduced in evidence, one showing that on August 10, 1950, the Beard tank had run oil over on the ground. Also a picture of the rod line at point of crossing of defendant's pipe line indicated that the rod line was kept off the pipe line only by about an eight-inch thick log into which the rod line had already cut for approximately a couple of inches.

Thomas M. Sparks, the game ranger, was called by defendant and asked about trouble the County had previously had with J. G. Beard over keeping a messy lease and permitting his tanks to overflow into the dry branch. On cross-examination he testified that the dry creek from the Dilley lease ran into Willow Creek and that creek into Pipe or Negro Prong, and that into Mud Creek, Mud Creek into Red River, and Red River into Lake Texhoma; and that fish had been caught out of Willow Creek.

This case was set for oral argument and submission on November 14, 1951, at which time the Attorney General in open court confessed error, and was directed by the court to prepare a confession of error in writing, setting up grounds therefor. On November 21, 1951, the Attorney General filed in this court a confession of error, stating that the theory of the defense, supported by substantial testimony, was that the responsibility for the alleged pollution rested upon a third person, and not on the defendant, and that the instructions of the court, and the refusal of the court to give certain requested instructions precluded the defendant from having its defense considered by the jury.

We have studied the brief filed by the plaintiff in error, hereinafter referred to as defendant, as in the trial court, and of course have studied the evidence, and agree that the case should be reversed by reason of the giving of instruction No. 6 complained of, and failure to give an affirmative instruction or instructions embracing defendant's theory of its defense, in that the record heretofore summarized supports the principal defense that the pollution rested on a third person. Turpen v. State, 89 Okla. Cr. 6, 204 P. 2d 298; Skelley v. State, 64 Okla. Cr. 112, 77 P. 2d 1162; Easter v. State, 74 Okla. Cr. 114, 123 P. 2d 691.

In the Turpen case we said:

"It is well settled that the defendant is entitled to an affirmative instruction embracing his theory of the defense."

Instruction No. 6 complained of reads:

"You are instructed Gentlemen that the law of this case comes under the Police Power of the State. In such cases and where pollution occurs a criminal penalty is imposed irrespective of any intent to violate the law—A duty being imposed upon all persons not to pollute any stream. Therefore, if you find from the evidence in this case, that oil escaped from the defendant's pipe line and got into one of the streams of this State, then you must find the defendant guilty as charged."

Even if intent was not a necessary element of the crime charged (and this question will be treated hereinafter), and even though the state in making out a prima facie case would only be required to show (as would be the case where intent were not an element) that the oil escaping into the stream came from defendant's pipe line, still, the defendant might have a defense to the charge. His defense here was that he had no connection with or control over the causative force producing the leak in his pipe line; that is, the leak was caused by a third party, who was named, and there was no evidence to the contrary; that immediately on discovery, the line was repaired. The evidence without contradiction sustained this defense. The instruction given summarily cut defendant off from any defense, and therefore, by reason of facts stated, constitutes reversible error. There are other imaginable defenses to a charge under the act in question, such as sabotage or **vis major**. The latter term is defined in Black's Law Dictionary, 3rd Ed., as follows:

"A loss **vis major** is one that results immediately from a natural cause without the intervention of man, and could not have been prevented by the exercise of prudence, diligence, and care. * * * In the civil law, this term is sometimes used as synonymous with 'vis divina', or the act of God."

Borrowing the language of Cothran, Justice, in State v. American Agricultural Chemical Co., 118 S. C. 333, 110 S. E. 800, 802:

"If one should do an act intentionally, the act is the result of his personal volition; and, if it should be an act prohibited by statute, he will not be heard to say that he did not intend to commit a crime in so doing [as would have been

the case for a violation under the first provision of § 273 here involved]. But, if it occurred by accident, his volition could not have preceded the act, and both the intention to do the act and the intention to commit a crime are necessarily absent. To constitute a crime the personal volition or negligence of the actor preceding the act is essential."

But the state is only required to show that the deleterious substances mentioned in the statute were under the control of, or belonged to the accused, and got in the public waters. After the state has thus made a prima facie case against the accused an issue of fact is presented for determination of the jury.

There was some evidence that a rain had carried some of the oil down the intermittent stream to a running stream, but that such rain was falling at the time defendant was first notified of the leak. Such evidence did not disclose negligence on the part of the defendant after learning of the acts of the third party, or the adoption of or acquiescence in the acts of the third party by defendant.

But the solution of this case does not end here. It is not quite so simple. There are several issues properly raised that do not seem prior hereto to have had the attention of this court and that duty impels us to not overlook even though the confession of error, well taken, as indicated, as to two grounds for reversal, would probably free the defendant of the conviction in the instant case. Although that would possibly satisfy such appellant, in the public interest we must treat some of the other issues raised.

The statute in question was enacted under the police power of the state. Some of the reasons bringing about the enactment are mentioned in the early case of State v. Wheatley, 20 Okla. Cr. 28, 200 P. 1004, where this court, after enumerating the basic facts, said:

"The state may, under its police power, for the protection in the streams, lakes, and ponds of this state, and for the purpose of encouraging the breeding of fur-bearing animals and other game which have access to the public waters of the state, prohibit the depositing of crude oil and other deleterious substances therein." (Italics now added.)

In Neptune v. State, 20 Okla. Cr. 54, 200 P. 1008, by per curiam opinion this court reiterated that the statute in question "was intended to keep the streams, lakes, and ponds of this state free from deleterious substances", and it was stated:

"primarily for the purpose of protection of fish and game and to encourage the breeding thereof."

But there was language in the Neptune case that indicated that the state must allege and prove that the deleterious substance placed in the stream, lake or pond prevented the habitation of or propagation of fish. However, such was held not necessary, and any language to the contrary in the Neptune case was expressly disapproved by this court in the case of Knopp v. State, 59 Okla. Cr. 143, 56 P. 2d 1193. See also Link v. State, 42 Okla. Cr. 361, 276 P. 240.

A question raised and to be considered, is whether or not this court adheres to the further language in the Neptune case, reading:

"Where a prosecution is instituted under such statute [Tit. 29 O. S. 1941, § 273] there should be a showing that the stream, lake, or pond is suitable for the breeding of fish or game or else is inhabited by them".

In exploring this question, we have found the reports of this and other states full of cases involving suits for damages arising from pollution of streams and ponds, and water-sheds, and generally the basis of such suits has

been the claim that individuals or corporations had negligently permitted deleterious substances, such as oil from pipe lines or pumps, to flow either directly into streams and lakes or by aid of rains to move along the water-shed and thereby reach such bodies of water, sometimes through gullies, resulting in the illness or death of live stock drinking from such water, and destruction of grasses and vegetation, and sometimes trees, touched along the way. See the important case of Verland Oil & Gas Co. v. Walker, 100 Okla. 258, 229 P. 235, holding that it was negligence as a matter of law for defendant to permit oil and salt water from its wells to flow into a stream. Also holding that Sec. 7969, C. O. S. 1921, 52 O. S. 1941 § 296, imposes a duty on all persons, under the police power of the state not to pollute any stream. See annotations under title; also Gulf Pipe Line Co. of Oklahoma v. Sims, 168 Okla. 209, 32 P. 2d 902; Gulf Refining Co. v. Carruthers, 185 Okla. 96, 90 P. 2d 407; Mid-Continent Petroleum Corp. v. Poage, 188 Okla. 626, 112 P. 2d 166; Shell Pipe Line Corp. v. Hall, 189 Okla. 145, 115 P. 2d 137.

Of course game animals or fish would suffer from the effects of such deleterious substances the same as domestic animals. Saw mill operators were also accused of carelessness with sawdust. In some states chemical manufacturers were likewise accused of carelessness with chemical waste, with like damaging results. And there has been litigation on account of deliberate dynamiting or placing of various deleterious substances in streams for the purpose of killing fish, though in such instances there was usually criminal prosecution.

So, from a consideration of the civil cases and facts apparently influencing the legislation here considered, it would appear that as to oil and salt water waste, as well as other deleterious substances, that vegetation and trees that provided food for game, was in many instances killed; sometimes damaging erosion was caused, and in instances animal and insect life in streams, lakes or ponds has been exterminated. · Even the intermittent streams where water might part of the year merely stand in holes has been made useless for game on account of the water being covered with oil or impregnated with other deleterious substances. So we gather from the litigation studied.

In Verland Oil & Gas Co. v. Walker, supra, there was involved a civil suit for damages on account of alleged water pollution. The defendant permitted waste oil, according to the evidence, to enter Elm Creek where for a portion of the year water flowed and where for the remainder of the year the water stood in holes, from which the plaintiff's cattle were watered. Plaintiff was a lessee from the landowner of the grazing rights and several of lessee's cattle died and many others became sick from drinking the polluted water. · The Supreme Court in considering the criminal statute here involved, § 6526 C. O. S. 1921, later § 273 Tit. 29 O. S. 1941, in connection with certain provisions of the civil law, said in the body of the opinion:

"Protection of the purity of the streams and lakes for the preservation of the life, health, and happiness of the ·people, as well as animal life, is the public policy of the state." [100 Okla. 258, 229 P. 236.]

While civil remedies afforded the individual redress, in the interest of the public, the Legislature of this State decided on the necessity of stringent safeguards for the fish and animal life of Oklahoma, and hence the legislation in question.

It is our conclusion that though a stream may be intermittent, and not suitable for the propagation or breeding of fish, still, the water standing in holes may play a part in the support of the game or animal life of the area, and for such

reason in a prosecution for contamination of water, under the statute in question, it is not necessary for the state to show that the stream or lake or pond involved, is of the type suitable for the breeding of fish or was actually inhabited by them. The inquiry shall be as to whether or not such intermittent stream was a tributary or feeder to and a part of the public streams or lakes or ponds of this state. In the within case the evidence to such effect was uncontradicted. Any language in the Neptune case contrary to the view here stated is expressly overruled.

Of course, if the lake or pond or watershed was privately owned or leased by the accused for the specific purpose of flowing and impounding salt water or oil, and was land-locked and free from overflow to the public streams, by the reasoning in the recent case of Washburn v. State, 90 Okla. Cr. 306, 213 P. 2d 870, such owner would be free to use his land as he might see fit. The Supreme Court of Oklahoma in suits involving damages has reached similar conclusions in a number of cases. See Tidal Oil Co. v. Pease, 153 Okla. 137, 5 P. 2d 389.

The defendant sets out that:

"The trial court erred in overruling the defendant's demurrer to the information for the reason that the facts alleged in the information do not constitute a public offense."

The charging part of the information has hereinbefore been quoted. Counsel argue:

"An examination of the information will reveal that it fails to state that the alleged crime was committed willingly, intentionally, through negligence or with any degree of animus or mens rea [a guilty mind; a guilty or wrongful purpose; a criminal intent]".

Defendant argues that by the provisions of the statute [heretofore quoted] "the defendant must either perform the acts of contamination or permit some other person to perform such acts."

It will be noted that in the information instead of using the word "permit" as set out in the statute, the county attorney used the word "allow", apparently considering it a synonym. Counsel claim that the words are not synonymous and urge that "allowing" contamination to take place, as charged in the within case, does not come within the crime of contaminating or permitting contamination as defined by the statute under which the prosecution was instituted.

It is asserted, in effect, that the distinction between the word "permit" as used in the statute, and the word "allow" used in the information, is so great that no crime was stated in the information.

It is additionally urged that if a criminal intent must accompany a prohibited act, then the information is further defective and charges no offense, in that it is not charged that the acts alleged to have been done by defendant were done with a criminal intent. And under a separate specification of error, following this line of thought, it is asserted that "the evidence fails to prove that the alleged pollution was committed by the defendant wilfully, intentionally or through such negligence as would amount to intention. For the purpose of this opinion these matters will be considered together.

It is stated that the word "permit" implies knowledge, permission or consent, and that such meaning does not attach to the word "allow". Cited in support of defendant's position is the case of Curtis & Gartside Co. v. Pigg, 1913, 39 Okla.

31, 134 P. 1125, 1129, where Commissioner Harrison for the court, in considering the relative significance of the words, stated in the body of the opinion:

" * * * The relative significance of the word, 'permit,' 'allow,' 'suffer,' is illustrated by Webster under the word 'permit,' as follows: 'To permit is more positive, denoting a decided assent, either directly or by implication. To allow is more negative, and imports only acquiescence or abstinence from prevention.' "

Our examination of a later edition of Webster's New International Dictionary (1930) G. & C. Merriam Co., defines "permit":

"To consent to; to allow to be done; to tolerate; to put up with; to grant permission; to allow." And "allow" is defined as: "To grant license to; to permit; to consent to; to authorize; to approve."

In the case of Snyder v. Central Vermont Ry., Inc., 112 Vt. 190, 22 A. 2d 181, 183, it is stated by the Supreme Court of Vermont:

" 'Allow' and 'permit' are synonymous and are often used as convertible terms."

Vol. 32 Words and Phrases, and Pocket Part defines the word "permit" as follows:

"The word 'permit' is a word of considerable elasticity; it lacks clearcut and precise definiteness and implies no affirmative act and involves no intent, but is mere passivity, abstaining from preventive action." (Italics added.)

Cited as supporting this statement is Wittenberg v. Board of Liquor Control, Ohio App., 80 N. E. 2d 711-717.

In the case of East Texas Oil Refining Co. v. Mabee Consolidated Corp., Tex. Civ. App., 1937, 103 S. W. 2d 795, 797, involving a suit for damages, one of the matters the court had for determination was whether or not the oil company "permitted" oil to flow into a stream and thereafter to ignite. The court adopted the statement from 48 C.J., p. 924, stated as follows:

"Permit is not a technical word: has two significations, the first being where the mind consents to the act; the second, where the mind does not affirmatively agree to the act, but having the right and means to interfere to prevent it from transpiring, fails to do so.

"Where the mind does not affirmatively agree to the act, but has the right and the means to interfere to prevent the same from transpiring, but from want of care or neglect the person makes no move to prevent the act from taking place." See, also, 70 C.J.S., Permit, page 565.

See, also, Words and Phrases, setting out cases from many jurisdictions, where the words in question are given varying shades of meaning. **The context in which used seems to have had an important bearing on the interpretations given.**

This court has said in a long line of cases that words used in a statute to define a public offense need not be strictly pursued in the information but other words conveying the same meaning may be used; that the true test of the sufficiency of an indictment or information is not whether it might possibly have been made more certain, but whether it alleges every element of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to meet. Martin v. State, 35 Okla. Cr. 248, 250 P. 552; Sweat v. State, 69 Okla. Cr. 229, 101 P. 2d 648; Barfield v. State, 71 Okla. Cr. 195, 110 P. 2d 316; Sparkman v. State, 67 Okla. Cr. 245, 93 P. 2d 1095; and Warren v. State, 24 Okla. Cr. 6, 215 P. 635.

But it is the view of this court that the inquiry into the shades of the meaning of "permit", and of "allow", or whether or not the words are synonymous is not required, and would not solve the problem at hand, because if the act in question requires "intent", the information would be insufficient regardless of which word was used; that it, whether the defendant "permitted", "allowed", or "suffered" the pollution to take place under any of the definitions. On the other hand, if intent is not a necessary element of the offense, then the rule above stated would apply without question, and the information would be sufficient. This for the reason that it would not matter whether the defendant positively assented to the deleterious substance being placed in the stream or whether he only stood by and acquiesced or merely abstained from prevention. In either case he would be liable. This thought will be further developed as we go along.

Proceeding with the inquiry concerning intent. It is the general rule that where a crime is created by statute, defining the offense created, it is sufficient in an indictment or information to charge the offense in the language of the statute. Robinson v. State, 8 Okla. Cr. 667, 130 P. 121; Smith v. State, 32 Okla. Cr. 121, 240 P. 143. Where, however, the letter of the statute is broader than the intention of the Legislature, the information must be so drawn as to effect the legislative intent. Stropes v. State, 120 Ind. 562, 22 N. E. 773; Schmidt v. State, 78 Ind. 41.

It must also be kept in mind that the common law doctrine of strict construction of criminal laws and proceedings has been abrogated by the statutes of this state, and the court in construing these statutes from its earliest decisions has held that a liberal and not a technical construction should be placed thereon. Burks v. State, 64 Okla. Cr. 285, 79 P. 2d 619. But at the same time we have said that courts will not ordinarily, by judicial construction, enlarge the scope and operation of a penal statute beyond the commonly accepted meaning of the language of the statute, or of its clearly expressed limitations. West v. State, 27 Okla. Cr. 125, 225 P. 556.

As we consider the question raised, it is well to note the definition of crime as set forth in the statutes of this state, Tit. 21 O. S. 1951 § 3, to-wit:

"A crime or public offense is an **act** or **omission** forbidden by law, and to which is annexed, upon conviction, either of the following punishments: * * *

"2. Imprisonment;

"3. Fine; * * *." (Italics added.)

It is also well to note that in Oklahoma we have no common law crimes as such; that all crimes are creatures of statute, Tit. 21 O. S. 1951 § 2, and are divided into felonies and misdemeanors. It is stated in Black's Law Dictionary, 3rd Ed. that:

"According to Blackstone, the word 'crime' denotes such offenses as are of a deeper and more atrocious dye, while smaller faults and omissions of less consequences are called 'misdemeanors.' But the better use appears to be to make **crime** a term of broad and general import, including both felonies and misdemeanors, and hence covering all infractions of the criminal law. In this sense it is not a technical phrase, strictly speaking, (as 'felony' and 'misdemeanor' are,) but a convenient general term."

There can be no doubt but that the Legislature had the authority to omit intent as an element of the crime in question. See 22 C. J. S., Criminal Law, § 30, page 85, and the long line of cases supporting the announced rule:

" * * * the legislature may forbid the doing of or the failure to do an act and make its commission or omission criminal without regard to the intent or knowledge of the doer, and ·if such legislative intention appears the courts must give it effect, and in such cases, the doing of the inhibited act constitutes the crime, and the moral turpitude or purity of the motive by which it was prompted, and knowledge or ignorance of its criminal character, are immaterial circumstances on the question of guilt; such legislation is enacted and is sustained for the most part, on grounds of necessity, * * *."

Also, as stated in United States v. Dotterweich, 320 U. S. 277, 64 S. Ct. 134, 136, 88 L. Ed. 48, it is said:

"In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger."

In the recent case of Morissette v. United States, 1952, 342 U. S. 246, 72 S. Ct. 240, 242, 96 L. Ed. ——, the Supreme Court of the United States had for consideration the question of whether the mere omission from a criminal enactment of any mention of criminal intent dispensed with it. One Morissette was indicted "on the charge that he 'did unlawfully, willfully and knowingly steal and convert' property of the United States of the value of $84, in violation of 18 U. S. C. § 641, 18 U. S. C. A. § 641, which provides that 'Whoever embezzles, steals, purloins, or knowingly converts' government property is punishable by fine and imprisonment."

It was the defendant's contention that he thought the property involved, abandoned, and that he had no intent to steal the same. The trial court ruled that as defendant admitted taking the property, and that he intended taking it, a ·felonious intent was presumed from the act of taking. The Circuit Court on appeal ruled that the offense in question requires no element of criminal intent because Congress failed to express such a requisite. The Supreme Court of the United States came to a different conclusion based largely on the fact that the crime of larceny is one of that list of crimes classified as **malum in se;** meaning, a crime that is essentially evil or infamous; that is, immoral in its nature and injurious in its consequences, without any regard to the fact of its being noticed or punished by the law of the state. Such are most all the offenses at common law (without the denouncement of a statute), as murder, larceny, etc. See Black's Law Dict. 3rd Ed.; and Words and Phrases.

In reaching its conclusion, Justice Jackson for the court stated:

"Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled nor static."

Justice Jackson first considers the historical background of crimes that depend on no mental element but consist only of forbidden acts or omissions, generally classified as **malum prohibitum;** meaning, a wrong prohibited; an act which is not inherently immoral, but becomes so because its commission is expressly forbidden by positive law. See Words and Phrases, and Black's Law Dict., 3rd Ed. The opinion is exhaustive and is replete with footnotes, and is recommended for detailed study.

Referring to "public welfare offenses" enacted by legislatures, where the element of intent would not be included, it is stated (omitting footnote references):

"This has confronted the courts with a multitude of prosecutions, based on statutes or administrative regulations, for what have been aptly called 'public

welfare offenses.' These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime. This has not, however, been without expressions of misgiving.

"The pilot of the movement in this country appears to be a holding that a tavernkeeper could be convicted for selling liquor to an habitual drunkard even if he did not know the buyer to be such. Barnes v. State, 1849, 19 Conn. 398. Later came Massachusetts holdings that convictions for selling adulterated milk in violation of statutes forbidding such sales require no allegation or proof that defendant knew of the adulteration. Commonwealth v. Farren, 1846, 9 Allen [Mass., 486] 489; Commonwealth v. Nichols, 1865, 10 Allen [Mass.] 199; Commonwealth v. Waite, 1865, 11 Allen [Mass.] 264 [87 Am. Dec. 711]. Departures from the common-law tradition, mainly of these general classes, were reviewed and their rationale appraised by Chief Justice Cooley, as follows: 'I agree that as a rule there can be no crime without a criminal intent, but this is not by any means a universal rule. * * * Many statutes which are in the nature of police regulations, as this is, impose criminal penalties irrespective of any intent to violate them, the purpose being to require a degree of diligence for the protection of the public which shall render violation impossible.' People v. Roby, 1884, 52 Mich. 577, 579, 18 N. W. 365, 366 [50 Am. Rep. 270].

"After the turn of the Century, a new use for crimes without intent appeared when New York enacted numerous and novel regulations of tenement houses, sanctioned by money penalties. Landlords contended that a guilty intent was essential to establish a violation. Judge Cardozo wrote the answer: 'The defendant asks us to test the meaning of this statute by standards applicable to statutes that govern infamous crimes. The analogy, however, is deceptive. The element of conscious wrongdoing, the guilty mind accompanying the guilty act, is associated with a concept of crimes that are punished as infamous. * * * Even there it is not an invariable element. * * * But in the prosecution of minor offenses there is a wider range of practice and of power. Prosecutions for petty penalties have always constituted in our law a class by themselves. * * * That is true, though the prosecution is criminal in form.' Tenement House Department v. McDevitt, 1915, 215 N. Y. 160, 168, 109 N. E. 88, 90 [Ann. Cas. 1917A, 455].

"Soon, employers advanced the same contention as to violations of regulations prescribed by a new Labor law. Judge Cardozo, again for the court, pointed out, as a basis for penalizing violations whether intentional or not, that they were punishable only by fine 'Moderate in amount,' but cautiously added that in sustaining the power so to fine unintended violations 'we are not to be understood as sustaining to a like length the power to imprison. We leave that question open.' People ex rel. Price v. Sheffield Farms-Slawson-Decker Co., 1918, 225 N. Y. 25, 32-33, 121 N. E. 474, 476.

"Thus, for diverse but reconcilable reasons, state courts converged on the same result, discontinuing inquiry into intent in a limited class of offenses against such statutory regulations.

"Before long, similar questions growing out of federal legislation reached this Court. Its judgments were in harmony with this consensus of state judicial opinion, the existence of which may have led the Court to overlook the need for full exposition of their rationale in the context of federal law. In overruling a contention that there can be no conviction on an. indictment which makes no charge of criminal intent but alleges only making of a sale of a narcotic forbidden by law, Chief Justice Taft, wrote: 'While the general rule at common law was that the scienter was a necessary element in the indictment and proof of every crime, and this was followed in regard to statutory crimes even where the statutory definition did not in terms include it * * *, there has been a modification of this view in respect to prosecutions under statutes the purpose of which would be obstructed by such a requirement. It is a question of legislative intent to be construed by the court. * * *' United States v. Balint, supra, 258 U. S. [250] 251, 252, 42 S. Ct. [301] 302, [66 L. Ed. 604, 605].

"He referred, however, to 'regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of crimes as in cases of mala in se,' and drew his citation of supporting authority chiefly from state court cases dealing with regulatory offenses. Id., 258 U. S. at page 252, 42 S. Ct. [301] at page 302 [66 L. Ed. 605]."

Our task now is to ascertain the legislative intent. As stated in Blevins v. W. A. Graham Co., 72 Okla. 308, 182 P. 247:

"To ascertain the intention of the Legislature in the enactment of the statute, the court may look to each part of the statute, to other statutes upon the same or relative subjects, to the evils and mischiefs to be remedied, and to the natural or absurd consequences of any particular interpretation."

We find that this court in State v. Wheatley, supra, has heretofore set out the reasons for the enactment of the statute in question, which we have already enumerated. The reasons were impelling and called forth the police powers of the State. Section 273 sets out that "No person shall deposit, place, throw," words that convey the meaning of volition or action; that is, affirmative action on the part of the person charged. But the statute further provides, "or permit to be deposited, placed or thrown, any lime, dynamite, poison, drug, sawdust, crude oil or other deleterious substance, in any of the streams, lakes or ponds of this state," etc.

Of course, the word "permit" or the closely related words "allow" or "suffer" imply that only the forbidden substances where belonging to or under the control of the person to be charged (who by such fact stands in responsible relation to the public danger sought to be averted), brings him under the act and requires him to assume the burden set out. If a person does not own or have control of the deleterious substances in question, then he would not be responsible for the action of other persons. He might be morally obligated to at least try to prevent the pollution, but it is elementary that he could not be legally obligated. On the other hand, if the person does own or control such substances, then it matters not with what intent the substances would be deposited in the waters, the damage would be the same. By reason of the vital public interest the state has enacted a measure in ultimate effort to prevent the damage.

This does not mean that in all cases the person charged would not have a defense. This case demonstrates a situation where he would, and other imaginable situations were suggested in other parts of this opinion that would afford a defense.

We may get an insight into the evils and mischiefs to be remedied by noting the many other statutes upon the subject of water pollution. There are a number of civil statutes (and additional criminal statutes) forbidding the pollution of streams. Tit. 52 O. S. 1941 § 296 making it negligence as a matter of law to pollute streams; also Tit. 82 O. S. 1951 § 901 forbids the pollution of the water supply of municipalities. Tit. 60, O. S. 1951 § 60 forbids the owner of a spring to divert the natural underground flow or pollute the same. Tit. 63 O. S. 1951 § 27 makes it unlawful for anyone to pollute or obstruct a water supply. Tit. 21 O. S. 1951 § 1223 makes it a crime to leave a carcass in any well, spring, pond or stream, while § 1194 of the same title makes it a misdemeanor to deposit any gas, tar, or refuse from any gas house or factory into any public waters, river or stream emptying into any such public waters, rivers or stream. Tit. 63 O. S. 1951, §§ 614-618 has to do with sewage deposits in streams. There may be other provisions, but this is enough to demonstrate the seriousness and importance to the public of keeping the waters of the State free of pollution, and for various public objectives in addition to that expressed in § 273 of the Act, Tit. 29 O. S. 1941, herein involved.

Intent is not made an element of the crime set out in Tit. 29 O.S. 1941 § 273, and the 1950-51 Legislature supplanted § 273 with § 409. The new statutory provision sets out that "No person, firm or corporation shall deposit," etc, and it further adds the proviso "in any place where the same will run or be washed into said streams, lakes or ponds" and eliminates the jail sentence, but adds that "each day or part of day during which such action is continued or repeated shall be a separate offense."

It seems clear to us that the statute, Tit. 29 O. S. 1941 § 273, now Tit. 29 O. S. 1951 § 409, enacted under the police powers of the state, considering the many other statutory provisions on the subject of water pollution, demonstrate the gravity of the problem and efforts made by the Legislature to keep the public waters of the state free from pollution, and convinces us that the Legislature intentionally omitted making "intent" an element of the crime charged. The recent re-enactment of the provision with the changes noted, and in view of the fact that § 273 was in effect over a long period of years, and still the Legislature on rewriting did not see fit to make "intent" an element of the crime defined, further convinces us that the omission was not an oversight, and under the authorities cited, we would not be justified in reading such intent into the statute.

By reason, however, of the errors heretofore mentioned, the case is reversed.

BRETT, P. J., and JONES, J., concur.