John Kenneth BOUTWELL, Appellant,

v.

The STATE of Oklahoma, Appellee.

Court of Criminal Appeals of Oklahoma.

Feb. 8, 1983.

T. Hurley Jordan, Public Defender, Robert A. Ravitz, Asst. Public Defender, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., State of Oklahoma, C. Elaine Alexander, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

CORNISH, Judge:

John Kenneth Boutwell was tried and convicted by jury in Oklahoma County District Court for First Degree Murder. The jury, which recommended imposition of the death sentence, found that three statutory aggravating circumstances were present: (1) that the defendant committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration; (2) that the murder was especially heinous, atrocious, or cruel; and (3) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution.

The appellant murdered a store clerk during the robbery of Little Dee's Grocery Market. Before the robbery, the appellant and his three friends decided that the clerk, David Devol, had to be killed so that they would not be later identified. The appellant initially fired four shots into the vic-

tim, then before making away, fired a fifth to insure Devol's death.

## I

The appellant asserts that his confession was the fruit of an illegal arrest. We find this argument to be without merit. Title 22 O.S.1981, § 196(3), provides an officer may make an arrest without a warrant, "[w]hen a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it."

█ Boutwell was arrested while in a car which matched the description of the automobile connected to the homicide. The arresting officer, who had information that the crime had been committed by several white males, made the arrest approximately two and one-half hours after the killing. His cognizance of these facts gave him probable cause to justify the arrest. *See,* *State v. McLemore,* 561 P.2d 1367 (Okl.Cr. 1977).

The appellant also argues that his confession was involuntary. He claims he was only qualifiedly informed of his right to have an attorney present. At the *in camera* hearing the trial court found that the appellant's statement was voluntary; that he had been fully advised of his constitutional rights and had affirmatively waived the presence of counsel. The record also shows that the interviewing officer had made it clear that no questions would be asked of him *until* an attorney was present, if the appellant desired one.

Evidence presented at the *in camera* hearing indicated that prior to the interview an attorney hired by the appellant's father had advised Boutwell to remain silent. After being informed of the *Miranda* rights, the appellant made this known to the police detective, whose purpose had been to interrogate him concerning robberies unrelated to this offense. When told this, the detective began to leave. The appellant, however, stopped him and asked what he had wanted to discuss. The detective told him he had wanted to discuss other robberies in Oklahoma City, but that he

could not talk to him further in light of his attorney's advice. The appellant then told him that he did not want an attorney, that he himself had not hired one, and that he would speak to him. Boutwell was again informed of his constitutional rights and indicated he understood them. The appellant told the detective that he had not been involved in any robberies "other than the other night," meaning the one at the convenience store.

We emphasize that the appellant, before making any inculpatory statements, told the detective that he did not want his father to bear the expense of retaining counsel and that he would go ahead and talk. Furthermore, the testimony shows he had indicated he understood an attorney would be appointed to represent him if he could not afford one.

The U.S. Supreme Court in its recent decision of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), held that a waiver of the right to counsel not only must be voluntary, but must also constitute a knowing and intelligent relinquishment of a known right or privilege. The Court held that the standard for determining waiver of right to counsel focuses on whether the accused understood his right to counsel and intelligently and knowingly relinquished it. The *Edwards* Court said that the Arizona Supreme Court had applied an erroneous standard in that they focused on the voluntariness of the confession. Additionally, the Court stated:

... [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges or conversations with the police.* [Emphasis added, footnote omitted.]

At the *in camera* hearing the detective testified he was aware that the accused had already invoked his right to remain silent, but his intention was to question the appellant about offenses unrelated to the robbery-murder. In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court concluded that the admissibility of statements obtained after a person in custody had decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored." There the Court found that subsequent questioning about an unrelated homicide, accompanied by complete *Miranda* warnings, was consistent with a reasonable interpretation of the accused's earlier refusal to answer any questions about the robberies for which he had been arrested. The introduction of the confession to the murder prosecution taken during the subsequent questioning did not violate *Miranda.*

We similarly find here that the appellant's previously invoked right to remain silent was not violated by the detective's subsequent questioning about unrelated offenses. Further, the appellant, rather than invoking his right to have counsel present, unequivocally expressed his desire to talk to the detective without counsel.

The appellant's conduct indicates he comprehended his right to have counsel present and knowingly relinquished it. The waiver of his right to have counsel present and his confession were not made under circumstances where pressures to talk weighed against his power to resist confessing. *See, Jurek v. Estelle*, 593 F.2d 672 (5th Cir.1979); *Stein v. New York*, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953).

The appellant's rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were not violated and the confession was properly admitted into evidence. *Hutton v. State*, 473 P.2d 303 (Okl.Cr.1970); *Arnold v. State*, 548 P.2d 659 (Okl.Cr.1976).

## II

■ The appellant next claims he was denied due process of law because Juror Nichols was not excused for cause. She was ultimately excused on defense counsel's peremptory challenge. From a reading of the voir dire it is clear that she was not irrevocably committed to imposing the death penalty. She stated that imposition of the death penalty would depend on the circumstances and that "[n]ot everyone should get the death penalty . . . ." Furthermore, the response "probably" to the question of whether the death penalty would be appropriate in a premeditated killing was equivocal, especially in light of her expressed desire to consider the circumstances.

In *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court enunciated the principle that the most that can be demanded of a venireman in this regard is that he be willing to *consider all* of the penalties provided by state law, and that he not be irrevocably committed before the trial has begun.

Accordingly, we find that the trial court did not err in refusing to excuse Juror Nichols for cause.

## III

Because of commonality of subject matter, we shall consider Propositions III and VI together.

■ The appellant assigns as error the admission of State's Exhibits No. 1, 12, and 27. Exhibit No. 1 was a color photograph depicting the victim lying dead on the floor of the convenience store. This photograph was probative in that it showed the relative position of the body and points of entry of the gunshot wounds. We find its probative value outweighed any prejudicial effect and that it was therefore properly admitted. *Glidewell v. State,* 626 P.2d 1351 (Okl.Cr. 1981).

■ State's Exhibits No. 12 and 27 were photographs of the victim taken while he was alive. The admission of photographs into evidence generally falls within the discretion of the trial court. *President v. State,* 602 P.2d 222 (Okl.Cr.1979). We fail to see the relevancy of these exhibits because the victim's identity was not at issue. With increasing frequency prosecutors in this state have been introducing for no relevant purpose photographs of the victims taken when they were alive. This practice should cease as it has little bearing on the issues of guilt or innocence to be decided by the trier of fact. In this case, however, when considered with the overwhelming evidence against the accused, these items would not have had the tendency to unduly prejudice the jury.

## IV

■ In his fourth assignment of error the appellant claims that the trial court should have admitted a family tree genealogy outlining the insane members of the Boutwell family. From what we can glean from the record, the outline had recently been prepared by a member of that family. The appellant's expert witness, Dr. Waterman, testified that, based on discussions he had had with the family, he believed it to be an accurate representation of the family pedigree.

The appellant asserts that the outline should have been admitted under the pedigree exception to the hearsay rule, citing *In Re Hamm's Estate,* 186 Okl.Cr. 610, 99 P.2d 895 (1940). A proper foundation for the exhibit, however, was not laid; the trial court therefore acted within its discretionary powers in excluding the exhibit.

## V

The appellant challenges the admission of the gun and the money which had been seized from the car. The gun, later identified as the murder weapon, was owned by a brother of one of the co-defendants. It was found in the trunk of the car; the money was found stuffed in the front seat cushion. The appellant argues that these items were seized during an impermissibly broad inventory search. The resolution of this question, however, turns not on the scope of the

search, but rather on the appellant's standing to object to a warrantless seizure.

◼ A criminal defendant cannot be afforded advantages of the rights or privileges personal to another. *Holman v. State,* 554 P.2d 74 (Okl.Cr.1976). Here the appellant was a passenger in the back seat of a car owned and driven by Robert Glidewell. The murder weapon was owned by a Glidewell brother who did not even participate in the crime.

In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court wrote:

> ... Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections. [Citations omitted.]

◼ Therefore, we rule that the appellant lacked standing to challenge the search because he had neither a property nor a possessory interest in the car, nor an interest in the property seized. See, *Robson v. State,* 611 P.2d 1135 (Okl.Cr.1980).

## VI

◼ The appellant next asserts that the hypothetical question the prosecutor propounded of Dr. Van OsDol on cross-examination during the first stage of the trial was improper. Dr. Van OsDol was asked whether the appellant, if under stress, would again commit an act such as the one for which he was being tried. In addressing this proposition we first cite the rule that the appropriateness of a hypothetical question rests largely in the discretion of the trial court. *McBirney v. City of Tulsa,* 505 P.2d 1403 (Okl.Cr.1973). Furthermore, the extent of cross-examination is also discretionary, and absent a clear abuse of discretion, we will not disturb the trial court's ruling. *Hickerson v. State,* 565 P.2d 684 (Okl.Cr.1977). The defense raised the plea of insanity; thus the challenged line of inquiry which pertained to an explanation of the diagnosis of latent schizophrenia fell within the scope of cross-examination.

◼ We find that Instruction Nos. 7 and 8, requested by the defense to cure the alleged error above, were properly refused. Our holding in *Thomsen v. State,* 582 P.2d 829 (Okl.Cr.1978), on this same issue, controls. In both cases the defense requested that the jury receive instructions on what the legal effect is of a verdict of Not Guilty by Reason of Insanity. The appellant in *Thomsen,* as here, relied on Laws, 1975, ch. 92, § 1, now 22 O.S.1981, § 1161, as authority for the instruction. As we stated then, this statute [1] is merely a procedural statement of disposition subsequent to the verdict. As such it is immaterial to the process of rendering a verdict concerning the sanity

1. Title 22 O.S.1981, § 1161, provides:

An act done by a person in a state of insanity cannot be punished as a public offense, nor can a person be tried, adjudged to punishment, or punished for a public offense, while he or she, as the case may be, is insane; but where in any criminal action by indictment or information the defense of insanity is interposed either singly or in conjunction with some other defense, the jury must state in the verdict, if it is one of acquittal, whether or not the defendant is acquitted on the ground of insanity and where the defendant is acquitted on the ground that he or she, as the case may be, was insane at the time of the commission of the crime charged, such person shall be discharged from further custody unless the court has reasonable grounds to believe that said person is presently mentally ill and that the release of such individual would be dangerous to the public peace or safety. In that event, the district attorney shall forthwith prepare, sign and file a petition for the commitment of said alleged mentally ill person. Determination of such alleged mental illness, commitment and discharge shall be made pursuant to the procedure set forth in the Oklahoma Mental Health Law, Title 43A, Oklahoma Statutes, Sections 54–82, inclusive.

of the accused. Therefore, this assignment of error is without merit.

## VII

The appellant argues that his motion for directed verdict should have been sustained. He contends that evidence of insanity went uncontroverted. The record, however, shows that during the State's cross-examination, an expert medical witness testified that the appellant knew at the time of the crime that it was wrong to commit an armed robbery and murder. A motion for a directed verdict admits for the sake of argument the facts which the State's evidence tends to prove. *Renfro v. State,* 607 P.2d 703 (Okl.Cr.1980). The trial court correctly denied the motion because competent evidence reasonably supported the charge.

## VIII

We combine for discussion the appellant's ninth and tenth propositions challenging the constitutionality of the Oklahoma death penalty statutes. The U.S. Supreme Court has upheld the constitutionality of capital punishment in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Oklahoma's statutory scheme for the imposition of the death penalty is similar to those of Georgia and Florida. Our statutes comply with the mandates of *Gregg, supra,* and *Proffitt, supra,* and are not violative of the Eighth and Fourteenth Amendments. *Hays v. State,* 617 P.2d 223 (Okl.Cr.1980); *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980).

## IX

We also consolidate the appellant's twelfth, thirteenth, and fourteenth assignments, which raise the most critical issues in this appeal.

We first consider whether the facts warranted an instruction during the punishment stage of the trial on the aggravating circumstance of murder for remuneration. Laws, 1976, ch. 1, § 6, now 21 O.S.1981, § 701.12(3), provides for the death penalty where "[t]he person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration."

The State argues that this instruction was appropriate because the appellant had been arrested with another co-defendant while in a car in which approximately seventy percent of the stolen money was recovered.

The aggravating circumstances of murder for remuneration is normally applied to the hired killer or to the hiree of a hired killer. *See McManus v. State,* 591 S.W.2d 505 (Tex.Cr.1979); *Doty v. State,* 585 S.W.2d 726 (Tex.Cr.1979). Here, even though it was agreed in advance that the clerk would be killed, it cannot be said that the appellant was "hired" by his co-defendants to kill the victim. Rather, he participated in the conception and perpetration of a jointly-committed robbery.

The fact that a greater share of money was found in the car in which the appellant was riding does not establish that this was a murder for pay. Nor do any other facts sufficiently lead to such a conclusion. Because the appellant was the triggerman in the robbery does not elevate the killing to the category of one for remuneration. The purpose of the killing was to avoid identification, not one in which the killing was perpetrated for hire.

In the alternative the State urges us to adopt a broad interpretation of paragraph (3) of Section 701.12 which would encompass killings for financial gain. However, this Court ordinarily will not by judicial construction enlarge the scope and operation of a penal statute beyond the commonly accepted meaning of the statute. *Magnolia Pipeline Co. v. State,* 95 Okl.Cr. 193, 243 P.2d 369 (1952).

In Webster's Third New International Dictionary, Unabridged (1963), "remunerate" is defined as "1: to pay an equivalent for," and "2: to pay an equivalent to for a service, loss, or expense." Remuneration

commonly denotes payment for services rendered.

 The wording and apparent purpose of paragraph (3) is not so broad as to include *all killings for pecuniary gain.* As we have long held, penal laws are to be interpreted strictly against the State and liberally in favor of the accused. *State v. Stegall,* 96 Okl.Cr. 281, 253 P.2d 183 (1953). Had the Legislature intended to provide a broader aggravating circumstance it would have done so. For example, the California Code, Title 47 Cal.Code (1981), § 190.2(a)(1), provides as an aggravating circumstance that "[t]he murder was intentional and carried out for financial gain." This statute clearly applies to killings carried out for monetary purposes.

But in Nebraska where the wording of the statute includes "for pecuniary gain," the aggravating circumstances has been construed not to be applicable in a case such as the one before us. There, Neb.Rev.Stat. § 29–2523(1)(c), provides as an aggravating circumstance that "[t]he murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant." The Nebraska Supreme Court in *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867 (1977) Code 9, concluded:

> ... [T]he murder was committed as part of an attempt to escape or to conceal the identity of the perpetrator, we do not consider the murder was committed for a pecuniary gain even though the result could possibly have been to enable Rust to keep the proceeds of the robbery.

In the instant case, neither the facts nor a plain reading of the Oklahoma statute support either of the State's proposed constructions of Section 701.12(3). We therefore find that the aggravating circumstance of murder for remuneration is not supported by the evidence in this case.

 We are of the opinion, however, that the evidence reasonably supports the finding that the murder was "especially heinous, atrocious, or cruel." We cite with approval *State v. Dixon,* 283 So.2d 1 (Fla. 1973), where that court stated:

[W]e feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

In this case the killing was merciless. The robbers planned well in advance to take the victim's life. Even more abhorrent and indicative of cold pitilessness is the fact that the appellant and the victim knew each other. The evidence also supports the aggravating circumstance that the murder was committed to avoid arrest or prosecution.

 Notwithstanding, where this Court finds one or more aggravating circumstances to have been improperly instructed on, we will not speculate as to whether the jury would have imposed the death sentence in the absence of the infirm aggravating circumstance. Because we cannot predict what sentence the jury would have imposed, and insofar the evidence supports the verdict of guilty, we are compelled to modify the sentence to life imprisonment in accordance with the authority of 21 O.S.1981, § 701.13.

In light of the foregoing it is not necessary to address the appellant's eleventh, fifteenth, and sixteenth propositions. Each allege error occurred during the punishment stage.

Judgment is AFFIRMED, except as to the imposition of the death sentence; the death sentence is vacated and the case shall be REMANDED AND MODIFIED to life imprisonment.

BUSSEY, P.J., concurs in part and dissents in part.

BRETT, J., concurs.

BUSSEY, Presiding Judge, concurring in part and dissenting in part:

I concur in the affirmance of the conviction but must respectfully dissent to the modification of the sentence. I believe that the case should be remanded for a jury sentencing procedure.