**James Raymond MOREAU, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–74–215.**

Court of Criminal Appeals of Oklahoma.

Jan. 10, 1975.

An appeal from the District Court, Jackson County, Weldon Ferris, Judge.

James Raymond Moreau, appellant, was convicted for the offense of Unlawful De-

livery of Marijuana; his punishment was fixed at a term of two (2) years imprisonment and a fine of One Thousand Dollars ($1,000.00), and he appeals. Affirmed.

Larry M. Weber, Harbison & Weber, Altus, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., James D. Bednar, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, James Raymond Moreau, hereinafter referred to as defendant Moreau, was charged, tried and convicted in the District Court, Jackson County, Case No. CRF–73–73, for the offense of Unlawful Delivery of Marijuana, in violation of 63 O.S.1971, § 2–401(B–2). His punishment was fixed at a term of two (2) years imprisonment and a fine of One Thousand Dollars ($1,000.00), and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, the State's first witness, Ronald Wayne Clodfelter, testified that he was employed as a forensic chemist by the Oklahoma State Bureau of Investigation. He identified State's Exhibit No. 1 as two (2) plastic baggies containing marijuana. He determined, by performing three (3) tests on their contents, that the baggies contained Cannabis Sativa, commonly referred to as marijuana. The remainder of his testimony concerned the procedures used by the Oklahoma State Bureau of Investigation to keep the evidence intact and subject to the proper custody.

The State's next witness, Howard Spraggins, testified that he was a bonded, commissioned law enforcement officer with the Jackson County Sheriff's Department and that he also worked out of the Sub-State District of the Oklahoma Crime Commission. His testimony dealt with the precautions taken to preserve the evidence from the time he received the two (2) baggies of marijuana from undercover agent Butler on the day of their purchase, until he delivered them to the laboratory of the Oklahoma State Bureau of Investigation.

The State's final witness during their case in chief was Gregory Scott Butler. He testified that he was a bonded deputy sheriff in Jackson County, and also worked as an undercover agent for the Oklahoma State Bureau of Investigation. During April, 1973, he was part of an undercover drug investigation in Altus, Oklahoma. On April 21, 1973, he had occasion to be in the Americats Boutique in the 200 block of North Main in Altus, Oklahoma. He stated that he and Darrell McDonald arrived there at approximately 2:35 P.M. Upon entering the shop, he engaged in a conversation with defendant Moreau. He stated that McDonald went to the rear of the shop and picked up a book and started reading. Defendant Moreau then asked him if he was going to get any speed in. He told him that he might be able to get some in next Thursday. Defendant Moreau then told him that he couldn't get hold of any psychedelics, at which time, defense counsel objected to this as being evidence of other offenses and improper. He then told defendant Moreau that he and McDonald were going to the Easter Pagent that night and that they needed to buy a couple of lids of marijuana. He related that after defendant Moreau went back to the rear of the shop and talked with McDonald, he came back and took him (Butler) to the rear of the shop and picked up a pasteboard box and took out three (3) plastic baggies containing a green leafy substance and said, "pick two." Butler took two (2) and put them in his pocket and asked the price. He was told they were ten ($10) dollars apiece, which he then paid for with a twenty ($20) dollar bill. At this point, he was asked to look around the courtroom and indicate whether the man who sold him the marijuana was present. His first reaction was, "I don't believe I see him," (Tr. 34). He then went on to say that the defendant, Moreau, appeared to be that person but that his hair was shorter and he was wearing different glasses. Then he stated that

the defendant was definitely the person with whom he had the transaction (Tr. 35). He testified that, after completing the transaction, he and McDonald left and drove to Howard Spraggins' house and turned the two (2) baggies over to him. He then identified State's Exhibit No. 1 as being the marijuana that he had purchased from the defendant.

Defendant James Raymond Moreau was the first witness to take the stand on his behalf. He testified that he was nineteen (19) years of age and lived at 1305 York Street in Altus, Oklahoma, with his parents, and was a student at Altus Junior College at the time he was arrested for this offense. He related that on April 20, 1973, he finished his 11:00 A.M. class at Altus Junior College and went home for lunch. Then, after lunch he went to the Altus Times Democrat, a newspaper where he was employed, and stayed until approximately 4:30 P.M. After leaving the Altus Times Democrat at 4:30, he went to the Americats Boutique and there saw his brother, Jay Moreau, who informed him that his sister had been involved in an accident and had fallen through a skylight in the shop. He stated that he had left the Altus Times with Dave McElfresh and that the two of them went to the hospital and saw his sister and then returned to the Americats Boutique where he ran the shop until about 9:00 o'clock that evening. After finishing work at the shop, he went home, got his sleeping bag, and he and Dave McElfresh drove to the North shore of Lake Altus and stayed there for the night. The next morning they rode their motorcycles on the beaches until shortly before 11:00 A.M., at which time they rode back to Altus and arrived at his home a few minutes before 12:00 o'clock noon. Upon arriving home, he observed that his brother, Jay, was working on a wheelchair for his sister. Mrs. Moreau prepared a pizza for lunch and after lunch, Jay left and went to the shop at approximately 1:00 P.M. He stated that he was at the house watching television with his mother, sister

and Dave McElfresh until shortly before 3:00 P.M., when he left and went to the Altus Times to begin work. He testified that he saw the circulation manager, Gregg Linton, and that they had a coke together until the press started. He worked at the newspaper until approximately 5:00 P.M., at which time he went to the Americats Boutique and relieved his brother, who went home and ate supper. He stated that his brother, Jay, arrived back at the shop at approximately 6:30 P.M. and that he went home and ate supper and stayed there until about 8:00 P.M. when he went back to the Altus Times for the second press run. He testified that after going back to the newspaper at 8:00 P.M., he worked there until 10:30 P.M. when he then made a delivery of newspapers to the surrounding areas and completed the delivery of the newspapers about 2:00 A.M., at which time he went home and went to bed.

He further testified that they kept certain business records at the Americats Boutique and that these records consisted of taking opening and closing balances from the cash register each time the shop was opened and closed. These business records for the dates of April 18, 19, 20, 21, 23, and 24 were identified and introduced into evidence. He identified the handwriting on the records by pointing out the differences between his handwriting and that of his brother, Jay, and further that the opening and closing figures for April 21, 1973, were written by his brother, Jay. For the purpose of showing the difference of handwriting of defendant Moreau and Jay Moreau, certain cancelled checks written by defendant Moreau prior to the date of the offense were identified and introduced into evidence. He then testified that he had the glasses which he was then wearing for approximately 8 or 9 months and for the purpose of so proving, introduced into evidence a certain photograph showing the type of glasses on May 24, 1973.

The next three (3) witnesses called by the defendant, David McElfresh, Arretta

Lou Moreau, and Gladys Moreau, substantially corroborated the testimony of the defendant. None of the three were able to say exactly when Ray left the house Saturday afternoon, April 21, 1973. All indicated that they were of the opinion that it was just a few minutes before 3:00 P.M., when he had to be to work at the newspaper.

The defendant's next witness was Robert Gilmore, President and Publisher of the Altus Times Democrat. He testified that his company maintained certain employment records on those employed and that they keep an hourly time on such employees. It was on the basis of these records that the employees were paid. He stated that on the date of April 21, 1973, the defendant was employed by his company. Through this witness, Defendant's Exhibit No. 5, which was an employee time and wage record for the defendant for the week of April 22, 1973, through April 28, 1973, was introduced into evidence. He further testified that this record reflected the wages and hours of Ray Moreau for Saturday, April 21, 1973. The record disclosed that he was paid for the hours of 3:00 P.M. to 5:00 P.M., and then from 8:00 P.M. until 12:00 P.M. on April 21, 1973.

The next witness to testify on behalf of the defendant was Gregory Duane Linton, who testified that he was a student at the University of Oklahoma and that he was employed as Circulation Manager of the Altus Times Democrat on April 21, 1973. He stated that he had been employed by the Altus Times for three and one-half (3½) years and that he was acquainted with Ray Moreau and had an independent recollection of the date of April 21, 1973. He recalled the defendant coming to work that day and that he came in at approximately 3:00 P.M. He remembered this because there was a wedding announcement in this particular paper for the girl that he used to date. He recalled showing it to Ray. He further testified that he and the

defendant worked that evening delivering papers to the surrounding towns in other counties.

The defendant's next witness was John Phillip Carlton. He testified that he was 17 years old and lived at 716 East Commerce, Altus, Oklahoma, with his parents. On April 21, 1973, he was at his home at noon eating lunch. After finishing lunch, he sat around the house for a period of time and then rode his bicycle from his home to Americats Boutique arriving there between 2:15 P.M. and 2:45 P.M. When he entered the shop, Jay Moreau was playing solitaire on a display shelf. He stated that he remained at the shop 20 or 30 minutes and during that time he never observed the defendant as being present in the shop.

At this point of the trial, after waiting a short period of time for two character witnesses who planned to testify on behalf of the defendant, defendant's counsel and the District Attorney stipulated to the testimony of the character witnesses as appears beginning at page 139 of the trial transcript as follows:

> Mr. Weber: Okay. Well, the testimony of Mr. Rankin anyway, that is Mr. Rankin was called as a witness, and he would testify that he was a counselor at the Altus Public Schools and served in that capacity for, I don't know, ten years or better, and that he has known the defendant for some period of time and is familiar with his background and so forth, and that he has had an occasion in the past to recommend him as a National Merit Scholar, and in his letter of recommendation stated that the defendant was most intelligent and probably the student possessing the most potential of any student at the Altus Public School at that time. And based upon that, it is his opinion that his reputation for honesty and truthfulness is good, and I think that pretty well covers what he would say.

> Mr. Jones: We will stipulate to that.

The Court: All right.

Mr. Weber: Chester Savage—can we stipulate he would testify that his character is good and his reputation for truthfulness and veracity, and a law abiding citizen.

Mr. Jones: That his reputation is good.

Mr. Weber: Yes. We will stipulate that he would testify that his reputation is good.

At this point, the defendant rested his case.

The State called Darrell McDonald as a rebuttal witness. He testified that he was 19 years of age, a student at Altus Junior College and that some time in April he had contacted Mr. Spraggins concerning the possibility of his assistance in investigation of drug traffic in Altus, Oklahoma. As a result of this conversation, he later assisted Gregory Butler by introducing him to those believed to be involved in drug use in Jackson County. The witness further testified that on April 21, 1973, he accompanied Mr. Butler to the Americats Boutique and entered the shop about 2:30 P.M. He stated that upon entering the shop, he went to the rear of same and began reading a book and that thereafter the defendant came to him and asked him about Butler. The defendant and Butler then went to the rear of the store and were there for about a minute. Upon Butler's return, he and Butler left the shop and drove to Mr. Spraggins' house where they delivered the two baggies that Butler had purchased. He further testified that, although he and the defendant were not friends, he knew both the defendant and his brother, Jay, and that the defendant was the man who participated in the transaction with Butler. At this point, the State rested.

■■ The defendant's first assignment of error alleges that he was denied a fair and impartial trial by intentional, voluntary and prejudicial remarks made by a witness during the State's case in chief which impugned defendant's reputation and characterized defendant as a dealer in drugs. In particular, he complains of certain state-ments made, on direct examination, by undercover agent Butler which were as follows:

"Q. What—tell us this conversation. What transpired?

A. I—entered the Americats Boutique, the informant went to the back of the store and picked up a book and started reading it. And the defendant asked me if and when I was going to get any speed in.

Q. What happened after that?

A. I told him I might be able to get some in next Thursday, the following Thursday. He then stated he couldn't get a hold of any psychedelics. He didn't have any that he had—

Mr. Weber: Your honor we are going to object to this as being evidence of other offenses of which is entirely improper, and this individual knows this. We'd ask the jury to be admonished not to consider it.

Mr. Jones: Your honor I don't see that this is evidence of any other offenses but we can leave that part out.

Q. Mr. Butler go ahead and tell us about the conversation leading up to the transaction—

Mr. Weber: Your honor we'd still ask for the same admonition for the jury.

The Court: Be overruled."

With this contention, we cannot agree. We are of the opinion that the testimony complained of was properly admitted and that the same was part of the res gestae. It is firmly established in the law that evidence of different offenses from the one charged is admissible when both offenses are so closely linked as to form a part of the res gestae. See Grimes v. State, Okl. Cr., 365 P.2d 739 (1961). Therefore, we find this proposition to be without merit.

■■ The defendant's final proposition of error asserts that where the State's

chief witness initially fails, at time of trial, to identify the defendant, the trial court should instruct that such testimony as to identity should be received with caution. In support of this contention, defendant cites the case of Melot v. State, Okl.Cr., 375 P.2d 343 (1962) in which we cited with approval the case of Commonwealth v. Kloiber, 378 Pa. 412, 106 A.2d 820 (1954) wherein it was held:

> "Mr. Justice BELL, speaking for the unanimous court, therein stated that testimony as to identification need not be received by the jury with caution and indeed may be treated as the statement of a fact where (1) the witness had an opportunity to observe the assailant clearly, (2) the witness is positive in his identification, (3) the witness' identification testimony is not weakened by prior failure to identify, and (4) the witness' testimony remains positive and unqualified even after cross-examination. However, if any one of these four conditions is not met, the accuracy of the identification is so doubtful that the court should warn the jury that the testimony as to identity must be received with caution."

After a careful examination of the record, it appears that although there was perhaps some hesitation on the part of the witness Butler, he did in fact identify the defendant, on direct examination, as the person who sold him the marijuana. Thus, the four (4) conditions set out above were met. Furthermore, the record does not reveal that the defendant objected to the instructions, nor did he submit requested instructions to the court for consideration. We have consistently held that where counsel is not satisfied with instructions that are given, or desires the court to give any particular instruction, or to more definitely or sufficiently state any proposition embraced in the instructions, it is the duty of counsel to prepare and present to the court such desired instructions and to request that they be given. In the absence of such request, the Court of Criminal Appeals will not reverse the case if the in-

structions generally cover the subject matter of inquiry. See Schapansky v. State, Okl.Cr., 478 P.2d 912. Therefore, we find that the instructions given substantially covered the subject matter of inquiry. Accordingly, this contention is without merit.

For all of the above and foregoing reasons, the judgment and sentence appealed from is affirmed.

BLISS, P. J., concurs.

BRETT, J., dissents.