Charles Olen THOMSEN, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-76-767.

Court of Criminal Appeals of Oklahoma.

July 24, 1978.

Rehearing Denied Aug. 29, 1978.

Mac Oyler, Oyler & Smith, Oklahoma City, and Alan McPherson, Durant, for appellant.

Larry Derryberry, Atty. Gen., Michael M. Jackson, Asst. Atty. Gen., for appellee.

OPINION

PER CURIAM:

Appellant, Charles Olen Thomsen, hereinafter referred to as defendant, was charged in the District Court, Dewey County, Case No. CRF-75-34, with the offense of Murder in the Second Degree, in violation of 21 O.S.1971, § 701.2. The defendant was tried

by a jury, convicted and sentenced to ten (10) years to Life in the State penitentiary. From this judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness was Louis Thomsen, son of the defendant and the deceased, Sammie Thomsen. He testified that his mother spent the night of October 10, 1975, at his home and that the next day he drove her to her house, located one-half mile north of Camargo. When they arrived the defendant was present. Mrs. Thomsen entered the house immediately and the witness entered shortly thereafter, finding his mother and father engaged in an argument which lasted most of the morning. Finally, as the argument subsided she asked the defendant for a divorce. The witness noticed that his father had taken at least one drink of liquor on the morning in question. The situation was aggravated when Mrs. Thomsen discovered that the defendant had burned all of her clothes. At this point, Mrs. Thomsen asked the witness to take her with him. As they were getting into the car the defendant appeared with a shotgun and fired one shot, killing his wife. Louis Thomsen then went into the house to call an ambulance and at this time the defendant left the scene in his car.

The State then called Howard Hollen who testified that he saw the defendant at approximately 2:00 p. m. on the day in question, and the defendant admitted having killed his wife.

Gladys Hixson next testified that she and her husband had known the defendant for more than ten years. On the day in question at approximately 2:10 p. m., the defendant drove up to her house and asked to see her husband. Upon learning that he was not home the defendant asked Mrs. Hixson to keep two guns in the house for him. Mrs. Hixson then left to meet her husband at a funeral. When they returned the defendant was still there and after Mr. Hixson talked to him they drove him to Taloga to see an attorney. Later that same day, at approximately 8:00 p. m., the two guns were picked up by a deputy.

The State then called Bruce Seidel, Undersheriff of Dewey County, who testified that he picked up the guns in question and turned them over to the Sheriff's Office.

Next to testify was Lindsey Salisbury, Sheriff of Dewey County, who said he arrived at the defendant's residence at approximately 2:00 p. m. and found the body of Sammie Thomsen lying on the ground next to a 1969 Ford. He further testified that he found two scotch bottles inside the kitchen, one with a small amount of liquid in it.

The State's final witness was Porter Leslie, a medical doctor and also medical examiner for Dewey County, who testified as to the cause and approximate time of death.

At this time the State rested, and the defense put on its case.

The first witness for the defense was J. Moore Campbell, a medical doctor practicing in Oklahoma City who taught at the University of Oklahoma Medical School. He testified that he had been treating the defendant since October, 1972, for back problems and later for spontaneous muscle cramps and headaches, which this witness diagnosed as being symptomatic of Huntington's Disease. He further testified that while researching the defendant's background he determined that this disease had been recurrent in the defendant's ancestry.

The doctor testified that one aspect of this disease is recurrent insanity, which is characterized by irrational behavior and psychotic conduct. Furthermore, he stated that such seizures could be precipitated by anxiety or stress such as would accompany the process of making decisions, and that this could account for the actions of the defendant on the day in question. However, this witness admitted that this disease is very difficult to diagnose, except in the later stages.

The defendant's second and final witness was Moorman P. Prosser, a medical doctor specializing in neurology and psychiatry, who in addition to private practice has been employed for the past 15 years as a professor of psychiatry, neurology and behavioral

science at the University of Oklahoma School of Medicine.

This witness testified that in his opinion the defendant was suffering from an organic brain disturbance. Furthermore, the past actions of the defendant were characteristic of Huntington's Disease and his family history lent weight to such a diagnosis. It was this witness' opinion that at the time of the shooting the defendant was suffering from temporary insanity due to the effects of Huntington's chorea, at which time he would be unable to control himself in a normal manner, or to weigh the difference between right and wrong.

At this point the defendant rested his case, and the State put on three rebuttal witnesses.

The State's first rebuttal witness was Karen Thomsen, wife of the defendant's brother, who testified that she saw the defendant's father daily for the last two to three years prior to his death, and she noticed no twitching of his limbs, his mental capacity appearing to her to have been normal.

The State then called Oswald A. Pardo, a medical doctor practicing psychiatry and the clinical director of Western State Hospital. He testified that the defendant was examined and observed for a period of several weeks by a team of six doctors, of which this witness was the chief examiner. Dr. Pardo stated that he was unable to find any clinical evidence, psychiatric or neurologic, of Huntington's chorea. Further, he found no evidence of any insanity which would preclude the defendant from being tried.

The State's final witness was Robert J. Englund, a physician with the University of Oklahoma Health Sciences Center and resident with the Department of Internal Medicine. This witness examined the defendant at Central State Hospital. The examination consisted of a detailed neurologic examination. The findings were that the defendant's brain and nervous system were within normal limits.

At this point the case was submitted to the jury.

In the first eight assignments of error, the defendant asserts that the trial court erred in giving Instruction Nos. 2, 5 and 7, and by failing to give instructions on manslaughter. A review of the record indicates that the defendant did not preserve these issues for review by this Court. It appears that the defendant did not object to the instructions and that he submitted no instructions concerning the points of law in question. This Court stated in *Holloway v. State*, Okl.Cr., 550 P.2d 1352 (1976), that:

"... We have consistently held that where defense counsel is not satisfied with the instructions that are to be given, or desires the trial court to give a particular instruction, or to more definitely or sufficiently state any proposition embraced within the proposed instructions of the trial court, it is the duty of defense counsel to prepare and present to the trial court such desired instructions and to request that they be given. In the absence of such request, this Court will not reverse the case if the instructions generally cover the subject matter of the inquiry. ..." (Citations omitted)

From a review of the instructions as a whole, it would appear that the instructions given by the trial court generally covered the subject matter and no substantial right of the defendant was violated. See, *Moreau v. State*, Okl.Cr., 530 P.2d 1061 (1975), and *Bryant v. State*, Okl.Cr., 521 P.2d 402 (1974). Furthermore, concerning the question of manslaughter instructions, both the attorneys for the State and for the defense stipulated at trial that manslaughter was not an issue, as reflected at page 420 of the trial transcript. Therefore, we find these assignments of error to be without merit.

As his ninth assignment of error, defendant asserts that the trial court erred in refusing the defendant's requested instruction No. 1. The instruction requested by the defendant was as follows:

"If you find the defendant NOT GUILTY BY REASON OF INSANITY you are then instructed that the laws of the State of Oklahoma provide that the Court, upon

belief that the defendant is presently mentally ill and his release would be dangerous to the peace or safety of the community, That he may be committed to a state institution for the mentally insane."

The defendant cites 22 O.S.Supp.1975, § 1161, as authority for the instruction.[1] This is merely a procedural statement of disposition subsequent to the verdict and is immaterial to the process of rendering a verdict concerning the sanity of the accused. Therefore, we find the defendant's ninth assignment of error to be without merit.

■ The defendant's tenth assignment of error concerns the trial court's admission of hearsay evidence of threats of death made by the deceased outside the defendant's presence. This contention is based upon an unresponsive statement made by Louis Thomsen, son of the defendant, during cross-examination by the defense. Clearly, the reply of this witness was unresponsive and constituted hearsay. However, a review of the record indicates that if error, it was harmless in that the testimony complained of neither resulted in a miscarriage of justice nor constituted a substantial violation of a constitutional or statutory right. See, 20 O.S.1971, § 3001. We find that the "minds of an average jury" would not have found the State's case significantly less persuasive had the testimony complained of been excluded. See, *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). Therefore, the defendant's tenth assignment of error is without merit.

The defendant's eleventh and final assignment of error is that the trial court abused its discretion in denying his motion for a change of venue and motion for medical examination.

■ Concerning the motion for change of venue, the defendant contends that due to pretrial publicity, the passions and prejudices of the inhabitants of Dewey County were so aroused as to render it impossible to empanel a jury which did not have a fixed opinion concerning this case. On numerous occasions this Court has ruled that the granting of a motion for change of venue is within the sound discretion of the trial court and that the action of the trial court will not be disturbed unless there is a clear abuse of that discretion. *Sam v. State,* Okl.Cr., 510 P.2d 978 (1973). This Court has held previously that a change of venue on the ground that a fair trial cannot be had in the district where the action is pending is warranted only where it is shown that the inhabitants of the district are so prejudiced that a fair and impartial trial for the defendant in that district would be impossible. See, *Mooney v. State,* Okl.Cr., 273 P.2d 768 (1954), and *Wininegar v. State,* 97 Okl.Cr. 64, 257 P.2d 526 (1953).

Further, in *Shapard v. State,* Okl.Cr., 437 P.2d 565 (1967), this Court, citing *United States v. Hoffa,* 156 F.Supp. 495 (D.C.N.Y. 1957), stated as follows:

" 'Mere fact that there has been widespread adverse pretrial publicity about defendant does not, by itself, establish reasonable probability that defendant cannot obtain a fair and impartial jury at criminal trial . . . .' "

---

1. Title 22 O.S.Supp.1975, § 1161, reads as follows:

"An act done by a person in a state of insanity cannot be punished as a public offense, nor can a person be tried, adjudged to punishment, or punished for a public offense, while he or she, as the case may be, is insane; but where in any criminal action by indictment or information the defense of insanity is interposed either singly or in conjunction with some other defense, the jury must state in the verdict, if it is one of acquittal, whether or not the defendant is acquitted on the ground of insanity and where the defendant is acquitted on the ground that he or she, as the case may be, was insane at the time of the commission of the crime charged, such person shall be discharged from further custody unless the court has reasonable grounds to believe that said person is presently mentally ill and that the release of such individual would be dangerous to the public peace or safety. In that event, the district attorney shall forthwith prepare, sign and file a petition for the commitment of said alleged mentally ill person. Determination of such alleged mental illness, commitment and discharge shall be made pursuant to the procedure set forth in the Oklahoma Mental Health Law, Title 43A, Oklahoma Statutes, Sections 54–82, inclusive."

As this Court stated in *Russell v. State*, Okl.Cr., 528 P.2d 336 (1974), if each juror indicates honestly that he can put aside any opinion formed as a result of information obtained outside of court and render a fair judgment on the evidence presented to him in court, it is sufficient to safeguard the jury process. *Russell v. State*, supra, is analogous to the instant case. A review of the record indicates that the "jurors were rigidly screened by both counsel for the defendant and the prosecution to ascertain whether or not the prospective jurors were capable of rendering a decision totally on the merits of the case presented at trial." *Russell v. State*, supra, at page 340. Furthermore, it is apparent that the defendant failed to utilize all of his peremptory challenges and as we stated in *Russell,* although not controlling, this is indicative of a "conclusion that at that time counsel felt that those prospective jurors who were incapable of reaching a verdict on the merits, had been excluded." Id. Also see, *United States v. Jobe,* 487 F.2d 268 (10th Cir. 1973). We can find no indication that the verdict was reached on the basis of anything other than evidence presented at trial.

Concerning the motion for medical examination, it appears from a review of the record that the defendant underwent medical examination at Western State Hospital, Ft. Supply, Oklahoma, and later at Central State Hospital in Norman, Oklahoma, where he was examined by staff physicians. The defendant's own physicians were given the opportunity to examine the defendant while he was in custody. It would appear that the defendant bases this proposition on the fact that he was not transported to Oklahoma City for examination by his own physicians at their offices. However, based on these facts, we feel that the defendant cannot support the contention of lack of proper medical examination. Therefore, we find the defendant's final assignment of error to be without merit.

For the above and foregoing reasons, the judgment and sentence of the trial court is *AFFIRMED.*

CORNISH, J., concurs in results.