1999 OK CR 36

**Brent Douglas ULLERY, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–97–965.**

Court of Criminal Appeals of Oklahoma.

Oct. 7, 1999.

Rehearing Denied Oct. 29, 1999.

---

Debbie Maddox, Robert G. Perrine, Capital Trials Division Indigent Defense System, Norman, Oklahoma, Attorneys For Defendant at Trial.

Tim Kuykendall, District Attorney, R. Richard Sitzman, Assistant District Attorney, Norman, Oklahoma, Attorneys For The State at Trial.

Lee Ann Peters, Indigent Defense System, Norman, Oklahoma, Attorney for Appellant on Appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer B. Miller, Assistant Attorney General, Oklahoma City, Oklahoma, Attorneys For Appellee on Appeal.

CHAPEL, Judge:

¶1 Brent Douglas Ullery was tried by jury and convicted of Murder in the First Degree in violation of 21 O.S.1991, § 701.7, in the District Court of Cleveland County, Case No. CF–93–496. The jury found that the murder was especially heinous, atrocious or cruel. In accordance with the jury's recommendation the Honorable William C. Hether-ington, Jr. sentenced Ullery to death. Ullery appeals from this conviction and sentence. After a thorough review of the record, we affirm Ullery's conviction. However, we have determined the sentence must be modified to life without the possibility of parole.

¶2 On March 24, 1993, Ullery went to Nancy Neal's Norman home to test drive her Mazda sports car, which she had advertised for sale. After they returned to the house, Ullery sprayed Mace in Neal's face. She ran for the door, but Ullery grabbed her and dragged her into the kitchen. As she screamed, he threw her on the ground and began kicking her head. When she continued to scream and struggle, he stabbed her five times in the back of the neck. He wiped the knife blade off, disabled the kitchen telephone, took the car keys, and drove the car to his Norman apartment. There he picked up his packed belongings and left. Ullery spent the night near Stillwater and drove northwest. He was stopped in Colorado after committing an armed robbery and shooting at a police officer. He confessed to Colorado and Oklahoma officers. He was committed for several months and tried in Colorado before being returned to Oklahoma for trial on the murder charge.

¶3 Ullery admitted he stabbed Neal but raised an insanity defense. Evidence at trial showed he suffers from schizoaffective disorder, a brain disorder characterized by major depression and psychotic symptoms, including delusions and hallucinations. This disease manifested itself when Ullery was still in high school. A genius, Ullery attended the Oklahoma School of Science and Mathematics. He concentrated in physics and was a brilliant student. His teachers and classmates agreed he had the potential for a remarkable academic future. Between Ullery's junior and senior years of high school his best friend and roommate was killed in a car accident. In the months thereafter Ullery became visibly depressed. He complained to friends of hearing voices and began listening to music constantly in an effort to minimize those hallucinations. More than once friends saw him cut his arms. He told them he sometimes had to see blood and feel pain to know he was in reality. Although

Ullery's school performance dropped dramatically he was accepted at both MIT and CalTech. However, he was unable to afford either university and enrolled at OU for the fall 1992 term on full scholarship. His school and social performance continued to deteriorate. That autumn he began seeing a mental health counselor at Goddard Health Center. She arranged for the university to allow Ullery to move out of the dormitories and in January, 1993, he moved to an apartment. Ullery stopped attending classes in January or February of 1993. His girlfriend, a student in California, broke up with him. The Goddard staff diagnosed him as moving into a major depression and prescribed Prozac (which he took only briefly). Ullery spoke to friends about his fear that he could not control himself, mentioned his hallucinations, and continued to cut his arms.

¶ 4   On February 11, 1993, Ullery told his counselor that he might kill himself or someone else, confirmed that he had a plan but would not disclose it, and refused to sign a contract stating that he would not harm himself or others. Alarmed, the counselor made some efforts to have Ullery temporarily committed under an emergency order of detention, but these failed. A supervising director at Goddard told Ullery's mother that he was a danger to himself or others and they could not treat him as an outpatient, and urged her to have him committed. She explored other treatment options. Ullery was alarmed at the thought that police might come to lock him up and determined to resist. He bought two shotguns and a knife, then went to a final counseling session where he confronted his counselor and said he was afraid the police would be after him. Thereafter he continued to deteriorate. He seldom slept, and his roommate did not see him between February and the time of the murder.

¶ 5   According to his own account and medical testimony, Ullery's hallucinations included voices talking and a man appearing to him; all these apparitions told him bad things about himself and suggested he do bad things to others. His delusions included a belief that police would lock him up in a snake pit from which he would never emerge;

that he was doomed if he stayed in Oklahoma, which was somehow responsible for his difficulties; that there was something sinister about and wrong with the red dirt in Oklahoma; that he had to escape; and that he had to die. He was unable to carry out any plans to kill himself, and decided to commit a crime that would force someone else to kill him or put him in a position where he had no choice but to commit suicide. He jotted notes apparently planning several types of robbery and wrote an apologetic document leaving his possessions to friends and family. He decided he had to steal a car and leave the state. Acting on this, he called Neal and arranged to see her car. He took the knife with him in case the Mace did not stop Neal from calling for help.

## PRETRIAL ISSUES

¶ 6   In his first proposition Ullery claims his conviction must be reversed and the charge of murder dismissed because the trial was not commenced within the time constraints of the Interstate Agreement on Detainers Act [IADA].[1] Ullery was arrested in Colorado in March 1993. On March 21, 1996, the State of Oklahoma filed a request for temporary custody under Article IV of the IADA. On June 20, 1996, Ullery filed a request for final disposition under Article IV of the IADA, which prosecutors and the Oklahoma court received on June 29. Ullery arrived in Oklahoma on July 16, 1996, and his trial began April 7, 1997. Ullery now alleges he was not brought to trial within 120 days, the time allotted under an Article III disposition, or 180 days, the time allotted under an Article IV disposition. He urges this Court to find Article III governs, find he was not timely tried, and apply the statutory remedy of dismissal.

¶ 7   Ullery raised this issue for the first time after the verdicts were rendered. In a special hearing on his motion to vacate the verdicts and dismiss the case, counsel apologized for not raising the issue sooner. We have held that for IADA purposes a trial

1.   22 O.S.1991, §§ 1345–49.

commences when jury selection begins.[2] The State argues Ullery waived his rights under the IADA when he failed to raise his claim before trial began. In *Rackley v. State*[3] we found the IADA did not apply, but stated in dicta that Rackley had apparently waived his IADA claim when he went to trial without challenging the transfer from federal to state custody. Ullery cites *Gallimore v. State*[4] to support his argument that this issue is jurisdictional and cannot be waived. However, in finding the IADA was violated, *Gallimore* did not discuss subject matter jurisdiction and noted Gallimore had not waived his IADA rights.[5] Ullery also claims, should we find he waived his IADA rights, that counsel was ineffective for failing to make this claim before trial. Given the importance of this issue of first impression, we choose not to rely on dicta or avoid the issue by finding waiver. Despite indications that Ullery may have waived his claim we will address this issue.[6] We find the IADA was not violated and counsel was consequently not ineffective for failing to raise a timely IADA claim.

¶ 8 This case presents an issue of first impression for this Court: when both the State and the defendant initiate transfer under the IADA, which time limit should apply? Which Article governs? The IADA is a uniform act adopted to encourage the "expeditious and orderly disposition" of untried charges pending against prisoners in other states.[7] The IADA is remedial in nature and should be liberally construed in the defendant's favor.[8] Under Article IV, when a state initiates a request for temporary custody the trial must begin no later than 120 days from the date the defendant arrives in that jurisdiction.[9] Under Article III, when a defendant requests a final disposition of retainer the time limit is 180 days from the date of receipt of the prisoner's request.[10]

¶ 9 Nationwide, courts have taken three different approaches to this problem. The State urges us to follow the few jurisdictions holding that where the defendant initiates Article III proceedings he invariably waives his Article IV rights (including the shorter time limit).[11] These cases determine that, as Article IV procedures and Article III procedures are inconsistent, an Article III filing automatically waives those Article IV procedures favorable to the defendant. Other jurisdictions reject this approach and hold the determining factor is which party first initiates IADA procedures.[12] Finally, several jur-

---

**2.** *Bowie v. State*, 1991 OK CR 78, 816 P.2d 1143, 1147.

**3.** 1991 OK CR 70, 814 P.2d 1048, 1051.

**4.** 1997 OK CR 46, 944 P.2d 939. Ullery also cites Article V(C) of the IADA. That section requires dismissal if a prosecution is not brought within the appropriate time limits but its language does not suggest failure to bring a timely prosecution is a jurisdictional defect. In *Bell v. State ex rel. Lane*, 1986 OK CR 14, 714 P.2d 205, 207, we held due to failure to bring a timely prosecution the trial court "lost jurisdiction" pursuant to Article V(C) of the IADA. However, this appears in context to be a reference to the clear statutory requirement that the prosecution be dismissed with prejudice, rather than a finding that the trial court had no subject matter jurisdiction to hear the case.

**5.** *Id.* at 942.

**6.** Were we to hold that Ullery waived his claim, we would have to address the issue as the underlying cause of his claim for ineffective assistance of counsel. We prefer to address the issue squarely on its merits.

**7.** 22 O.S.1991, § 1347, Article I; *United States v. Mauro*, 436 U.S. 340, 351, 98 S.Ct. 1834, 1842, 56 L.Ed.2d 329 (1978).

**8.** *Gallimore*, 944 P.2d at 942.

**9.** 22 O.S.1991, § 1347, Article IV.

**10.** 22 O.S.1991, § 1347, Article III.

**11.** *State v. York*, 66 Ohio App.3d 149, 583 N.E.2d 1046, 1050 (1990); *Yellen v. Cooper*, 828 F.2d 1471, 1474 (10th Cir.1987). *See also United States v. Eaddy*, 595 F.2d 341, 344–45 (6th Cir. 1979) (prisoner may waive IADA Article IV rights if he is aware of and understands those rights and the waiver is voluntary).

**12.** *State v. Webb*, 570 N.W.2d 913, 915 (Iowa 1997) (Article IV applies where state is first to file after a detainer on the charges is lodged with the other jurisdiction); *Shewan v. State*, 396 So.2d 1133, 1134 (Fla.App. 5th Dist.1980) (180–day limit applied where defendant made Article IV request for disposition before State took custody); *Price v. State*, 237 Ga. 352, 227 S.E.2d 368, 371 (Hill, J., specially concurring) (Article

isdictions apply both Articles when both parties initiate IADA procedures and look to see which, if any, provisions have been violated in determining which time limit applies.[13]

¶ 10   We believe the last approach is the most balanced. Where both the State and the defendant initiate IADA procedures, we may assume that both parties wish a speedy disposition of the outstanding charges. As both parties have invoked the IADA provisions, principles of fairness suggest the most reasonable approach is to compute the time under each provision and see which limit expires first. Under Article III, Ullery's trial should have begun within 180 days of June 29, 1996. Under Article IV, Ullery's trial should have begun within 120 days after his July 16, 1996, return to Oklahoma. Ullery's trial began on April 7, 1997.

■ ¶ 11   We examine the record to discover whether these time limits were tolled by either (1) necessary and reasonable continuances that were granted for good cause in open court[14] or (2) delays occasioned by the defendant.[15] Both parties agree the time limits were tolled by Ullery's competency proceedings held in the fall of 1996. Ullery filed an application for determination of competency to stand trial on August 7, 1996, and was adjudged competent at a December 5, 1996 post-examination competency

hearing.[16] We reject Ullery's argument that we should not include the delay between his evaluation and return to jail and the court date on which he was found competent in this tolling period. Ullery was unable to stand trial for the 111 days in which the question of his competency to stand trial was pending and both time periods are tolled by that number.

■ ¶ 12   We also find the trial court granted a necessary and reasonable continuance for good cause. At the January 9, 1997, arraignment hearing both parties agreed to a trial date of April 7, 1997. Ullery correctly notes that no grounds for this continuance appear on the record. In arguing the prosecutor promised to try Ullery within IADA limits, he relies on trial counsel's argument from the May hearing on this issue, suggesting the prosecutor had promised to try Ullery by "such-and-such a date." This statement does not appear in the January 9 transcript. Rather, Ullery's counsel asked whether they were still looking at an April 7 trial date and the prosecutor and court agreed. We recognize we held in *Bell*[17] that good cause is not shown for a delay under the IADA where a prosecutor failed to file an affidavit with his requests for continuance. However, this is not a case in which one side has requested a continuance for evidentiary reasons. Here, both parties

III time limit controlled where defendant filed Article III request after state filed Article IV request, but time limit tolled by defendant's simultaneous trial in other jurisdiction). In *State v. Mason*, 90 N.J.Super. 464, 218 A.2d 158, 162–63 (App.Div.1966), the New Jersey appellate court specifically found Article IV did not apply because only the defendant invoked the IADA, and held the State could not, after the 180–day period lapsed, retroactively file an Article IV request, and attempt to invoke the 120–day limit.

**13.** *State v. Willoughby*, 83 Hawai'i 496, 927 P.2d 1379, 1386 (App.1996) (Article IV applies where state was first to file request and Article IV time limit expired first); *People v. Morris*, 160 Misc.2d 648, 610 N.Y.S.2d 725, 728 (N.Y.Co.Ct.1994) (time, computed under both Articles, had expired under both); *State v. Burrus*, 151 Ariz. 572, 729 P.2d 926, 932–33 (App. Div. 1 1986) (Article III governs where defendant initiated by letter, state indicated willingness to accept transfer under either Article III or Article IV, and 180–day limit expired first); *Foran v. Metz*, 463 F.Supp. 1088, 1097 (S.D.N.Y.), *aff'd, Foran v. Metz*, 603 F.2d

212 (2nd Cir.), *cert. denied*, 444 U.S. 830, 100 S.Ct. 58, 62 L.Ed.2d 38 (1979) (Article IV applies where 120–day limit expired first and state filed first request for temporary custody).

**14.** 22 O.S.1991, § 1347, Articles III(a) and IV(c) (trial court may grant any necessary or reasonable continuances for good cause shown in open court with prisoner or counsel present).

**15.** 22 O.S.1991, § 1347, Article VI(a) (time period tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the trial court).

**16.** The docket and record reflect that the hearing was held and Ullery was found competent on December 5, 1996, and a preliminary hearing date set for December 19. However, the trial court's written order finding Ullery competent was not filed until January 9, 1997.

**17.** *Bell*, 714 P.2d at 206. *Bell* relied on the statutory requirements that a motion for continuance based on absence of evidence or an absent

agreed to a trial date. The reasoning in *Bell* does not apply. We have also held the IADA is not tolled where the state fails to try a defendant because a jury docket is not available.[18] Again, we are not suggesting the IADA limits are tolled here by "unexplained extensions of continuances simply because the record does not attribute those extensions to the prosecution."[19] We find it reasonable to toll the IADA limits where the defendant requests or agrees to, and benefits from, the delay.[20] The record clearly shows counsel requested and agreed on an April 7 trial date. The 88 days between this agreement and trial are tolled.[21]

¶ 13 We have found that competency proceedings and a necessary and reasonable continuance, granted for good cause, tolled the IADA time limits here for 199 days. Under either article Ullery was tried before the IADA time limits expired. Under Article III Ullery's trial should have begun by December 26, 1996; the tolling period for competency proceedings brought that date to April 16, 1997. Under Article IV trial should have commenced by November 14, 1996; the competency tolling period brought that to March 4, 1997, and the further tolling provided by the parties' agreement brings the April 7 date within the 120-day limit. Ullery's statutory rights under the IADA were not violated and this proposition is denied.

¶ 14 In Proposition Two Ullery claims the trial court erred in admitting his confession to Colorado law enforcement officers. After his arrest, Ullery spent the night at the hospital and was taken to the Adams County jail. He spoke with Colorado detectives at 6:45 a.m. and 7:42 a.m. Ullery claims the videotape of these conversations should not have been admitted in first and second stage because officers did not honor his unequivocal request for counsel. On the contrary, officers ceased questioning after Ullery asked to speak with an attorney and did not resume interrogation until he reinitiated contact. Ullery then waived his right to an attorney and confessed to the Oklahoma crime.

¶ 15 The State must prove Ullery's waiver of rights "was (1) the product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[22] After requesting counsel a defendant may not be questioned further unless he has counsel or reinitiates interrogation.[23] After a defendant asks for an attorney, questioning must stop and officers may not initiate contact without counsel present whether or not a defendant has consulted with counsel.[24] Custodial interrogation equals both express questioning and any words or actions that police should know are reasonably likely to elicit an incriminating response, with the focus on the defendant's perception rather than the officer's intent.[25] A defendant reinitiates interrogation when he represents a desire to open up a general discussion relating directly or indirectly to a criminal investigation.[26]

---

witness must be accompanied by affidavit. 22 O.S.1991, § 584; 12 O.S.1991, § 668.

18. *Gallimore*, 944 P.2d at 944–45.

19. *Id.* at 945.

20. *See, e.g., Burrus*, 729 P.2d at 932–33.

21. We decline to find counsel ineffective for agreeing to the April trial date. Nothing in the record shows counsel's performance in reaching this agreement was deficient. *Hooper v. State*, 1997 OK CR 64, 947 P.2d 1090, 1115, *cert. denied*, —— U.S. ——, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998).

22. *Le v. State*, 1997 OK CR 55, 947 P.2d 535, 542, *cert. denied*, —— U.S. ——, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998); *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

23. *LaFevers v. State*, 1995 OK CR 26, 897 P.2d 292, 299, *cert. denied*, 516 U.S. 1095, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).

24. *Minnick v. Mississippi*, 498 U.S. 146, 147, 111 S.Ct. 486, 488, 112 L.Ed.2d 489 (1990).

25. *Sattayarak v. State*, 1994 OK CR 64, 887 P.2d 1326, 1329; *Rhode Island v. Innis*, 446 U.S. 291, 299–300, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980).

26. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983).

¶ 16 In determining whether a confession is the product of the maker's free and unconstrained choice we look to the totality of the circumstances surrounding it, including the defendant's character and the details of the interrogation.[27] The State must prove a waiver is valid by a preponderance of the evidence.[28] Where sufficient evidence supports a trial court's *in camera* ruling that a defendant's statements are voluntary and admissible, we will not disturb that ruling.[29] Sufficient evidence supports the trial court's ruling that Ullery's statements were voluntary.

¶ 17 As the interview began Ullery asked several times whether he could get the death penalty. The Colorado detectives consistently replied that he probably could not receive that penalty in Colorado, and because they did not know the state of Oklahoma law they could not say what penalty he might receive in this state. Ullery eventually decided to consult an attorney to be certain he could receive the death penalty. He said he would be willing to talk to detectives after this question was answered. The interview ended and, after eighteen minutes of desultory conversation, Ullery was removed to a holding cell. Shortly thereafter he asked to speak to Detective Lynch, was brought back to the interview room, and waived his *Miranda* rights. He then confessed to the Oklahoma crime.

¶ 18 On its face, this sequence of events shows a clear pattern of waiver, invocation, reinitiation, and subsequent waiver of the right to counsel followed by a confession.[30] Ullery claims his decision to reinitiate contact was actually coerced by events occurring in the eighteen-minute delay between his request for counsel and his removal to a holding cell. The videotape shows he stayed in the interview room with Detective Lynch. During that time, a pattern formed: Detective Lynch would stare at Ullery, who would fidget and finally make some comment. Brief conversation would be punctuated by more stares, etc., until Ullery finally asked what they were waiting for. He was moved shortly thereafter.

¶ 19 Although this interlude appears odd, nothing in the officer's actions or conversation support Ullery's claim of coercion. Ullery argues Lynch knew Ullery wanted to die and played on this by suggesting an attorney would not let him talk to police. Ullery wondered when he would see an attorney; Lynch told him, warned him that an attorney would tell him not to talk, and explained that detectives could not speak with Ullery after he saw an attorney. Ullery replied, "What if I ask?" and Lynch said Ullery could reinitiate questioning by asking for detectives at any time. Explaining the reinitiation procedure is not inherently coercive.[31] When Lynch offered his card, Ullery

---

27. *Mitchell v. State*, 1994 OK CR 70, 884 P.2d 1186, 1194, *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. Insofar as Ullery suggests his confession is invalid due to his mental illness, this suggestion must fail. Police must take advantage of his alleged mental state to obtain his statement, and we have determined, *infra*, the Colorado detectives did not improperly play on Ullery's depression and desire to die. *McGregor v. State*, 1995 OK CR 71, 885 P.2d 1366, 1378, *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50; *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473.

28. *Le*, 947 P.2d at 542; *Colorado v. Connelly*, 479 U.S. at 168, 107 S.Ct. at 522.

29. *LaFevers*, 897 P.2d at 298. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), established a defendant's right to an *in camera* hearing on the voluntariness of his confession.

30. The State inexplicably attempts to argue that Ullery never invoked his right to counsel. This invocation was apparently clear to everyone in the interview room—Ullery said he wanted to talk to an attorney and the officers ended the interview. The State's analogy to *Ray v. State*, 1988 OK CR 133, 758 P.2d 823, 825, fails; there, the defendant wanted an attorney to tell him whether police had the authority to transport him from one county to another. By contrast, Ullery made a clear request to consult with counsel on a substantive issue which would bear on his decision to talk to police.

31. *Sadler v. State*, 1993 OK CR 2, 846 P.2d 377, 384–85 (explanation of reinitiation not itself likely to elicit incriminating response; police suggestion that co-defendant implicated defendant in murder would elicit such a response but was made before defendant invoked his right to counsel).

took it, commenting, "Okay, that would be a good idea." Ullery and Lynch also discussed Ullery's family, a brief version of his visits to Goddard Health Center, and his worry that police would lock him up in a mental institution. None of Lynch's questions at this time either elicited or might have resulted in incriminating statements.

¶ 20 Ullery argues his subsequent comment shows the detectives knew this interlude encouraged him to reinitiate questioning. After returning to the interview room, he asked whether the officers would like him to explain why he made this decision, but, he argues, they prevented him from explaining. On the contrary, the videotape suggests the officers had no suspicious agenda in refusing to hear Ullery's explanation; Lynch said "before we do that" he wanted to re-advise Ullery of his *Miranda* rights, then went right on to Ullery's statement about the crimes. Ullery had the opportunity to reraise the subject, but did not. It appears the detectives forgot about asking why Ullery changed his mind because they were more interested in what he had to say about the crimes.

¶ 21 Ullery invoked his right to counsel but subsequently reinitiated conversation with detectives, waived his right, and confessed. Detectives did not coerce this decision. Ullery's waiver was voluntary and the trial court did not err in admitting the videotaped confessions. This proposition is denied.

¶ 22 In his third proposition Ullery argues admission of improperly redacted tapes and transcripts of his confessions violated his rights to due process and a fair trial. Ullery's Colorado confession was videotaped and the Oklahoma confession was audiotaped. The trial court ultimately ruled that edited versions of both tapes would be admitted in first stage. Edited transcripts would be admitted and available for the jury to use in deliberations but not provided while the tapes were played in open court. The trial court ordered (1) the State to redact any reference to the Colorado crimes and Ullery's gunshot wound, and (2) the parties to agree on redacted version of transcripts.

The trial court held that full transcripts would not be available to the jury. Ullery objected to the admission of the tapes because the confessions were involuntary and cumulative. Before the *Jackson–Denno* hearing counsel objected to admission of the transcripts, citing the best evidence rule, and noted "problems are there" in connection with the redacted tape before being cut off. The record shows no other objections to the redactions or edited tapes. Counsel successfully objected to a proposed State instruction which referred to the edited portions of the tapes and transcripts, arguing that it would call attention to the editing.

¶ 23 Ullery now complains that (1) the trial court erred in admitting both the tapes and transcripts into evidence and allowing the jury to use them in deliberations, and (2) the edited transcripts contain prejudicial errors which changed the nature of Ullery's statement. Ullery objected to admitting both the tapes and transcripts, and that issue is preserved for appeal. He did not object to the content of the edited transcripts, and we review that claim for plain error only. We find merit in neither claim.

¶ 24 We begin by determining whether errors in transcription altered Ullery's statements so prejudicially as to go to the foundation of his case or take from him a right essential to his defense.[32] Ullery claims error in three particular comments. First, regarding Ullery's appointment with Neal, the edited videotape transcript says "I set it up" instead of "I said I'd show up." We disagree with Ullery's claim that this minor change implies Ullery "set up" the murder. Furthermore, Ullery's actual words are clear on the tape. Second, when asked if he planned to kill Neal, the edited audiotape transcript says "just one of those (inaudible) things" rather than "just one of those 'the moment' things." Again, we do not agree that this omission changes the import of Ullery's statement, particularly since the phrase is clear on the tape and he uses similar descriptions elsewhere in his statements. Finally, Ullery complains of both redaction and transcript editing in a state-

32. 20 O.S.1991, § 3001.1.

ment from the video confession. Referring to Neal's death, the detectives asked whether that was something Ullery thought might have to happen. Unedited, Ullery says yes, if he was just going to straight out kill Neal he probably would have brought the gun. As the trial court had appropriately directed the State to remove the references to guns in the first stage, on the redacted tape he says, "Yes, if I was just going to straight out kill her [cut]." The edited transcript reports this as "Yes, it was just you know straight out kill her (inaudible)." The combination of editing and redaction does suggest a stronger intent than found in the original statement. However, in the immediately preceding comment both tape and transcript record Ullery as saying he had a knife "just in case", and the following exchange has him agreeing he meant to play it by ear and see what happened. In context, this transcript mistake does not alter Ullery's statement of intent from an admission of an unplanned killing to a confession to premeditated murder. There is no plain error here.[33]

¶ 25 We now determine whether the trial court erred in admitting both the tapes and transcripts. Edited tapes were played in first stage, and the unedited Colorado tape was played during second stage. Although the jury was not provided transcripts while the tapes were played, edited transcripts were admitted for jurors' use during deliberations. Full transcripts were prepared as court exhibits but not provided to the jury. While deliberating, the jury requested audio and video recorders to replay the tapes. Both parties on appeal make confused arguments. Ullery complains jurors were not warned the transcripts might have errors, although an instruction to that

effect was removed at his request. He argues the jury could not catch the errors in transcription since they did not have the transcripts while the tape was played in court, without acknowledging the jury had both tapes and transcripts in deliberations. The State argues both that the transcript was useful since the jury could refer to it instead of replaying the tapes, and that any errors in transcription were harmless since the jury had the tapes for comparison.

¶ 26 We have not ruled on this precise issue. Both parties cite *Davis v. State*,[34] in which we determined it was not error to admit a transcript in lieu of taped exhibits and rejected previous dicta suggesting that admission of transcripts might violate the best evidence rule. We noted that, as only the transcript went to the jury, there was no problem of cumulative evidence or undue emphasis on the defendant's confession which might be caused by admission of both a tape and transcript. We also emphasized there was no claim the transcript itself was inaccurate or improperly admitted or contained inadmissible evidence. We disposed of Ullery's claims of inaccuracy above and the transcript was not otherwise improperly admitted. The questions of undue emphasis and cumulative evidence remain. The record as a whole clearly reflects that the edited transcripts were admitted solely as an aid to the jury in deliberations. They were neither used while the tapes were played in court nor referred to in argument. It is impossible to overemphasize the importance to the jury of Ullery's confession. Both sides argued it proved his guilt or innocence. Under these circumstances we cannot find the transcripts were cumulative or unduly influenced the

---

33. Ullery argues in reply that counsel's failure to review and object to the State's redactions and edited transcripts constitutes ineffective assistance of counsel. As we have determined any errors in transcription did not result in an unfair or unreliable trial, this claim must fail. *Lockhart v. Fretwell*, 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, 693 (1984).

34. 1994 OK CR 72, 885 P.2d 665, 669. Beyond citing *Davis*, the State fails to address Ullery's substantive argument, relying instead on waiver

and speculation regarding the "reasonable" jury's actions here. We decline to enter into either side's speculation on what the jury may have done with transcripts during deliberation. *See, e.g., Salazar v. State*, 1996 OK CR 25, 919 P.2d 1120, 1124–25 (Court will not speculate on results if evidence differed); *Perry v. State*, 1995 OK CR 20, 893 P.2d 521, 535 (Court will not speculate on degree of suffering victim experienced); *Pickens v. State*, 1994 OK CR 74, 885 P.2d 678, 682, *overruled on other grounds by Parker v. State*, 1996 OK CR 19, 917 P.2d 980 (Court will not speculate on effect of videotape).

jury's verdict. The trial court did not err in admitting the tapes and transcripts. This proposition is denied.

## ISSUES REGARDING JURY SELECTION

■ ¶ 27 In Proposition Nine Ullery claims he was denied due process and a fair trial by the trial court's refusal to instruct the jury on the dispositional consequences of a not guilty by reason of insanity verdict. Ullery never contested the State's allegation that he killed Neal. During individual voir dire counsel told prospective jurors that Ullery admitted the killing and relied solely on his insanity defense. The trial court denied Ullery's repeated requests to instruct the jury on the consequences of a verdict of not guilty by reason of insanity, as well as his offer of testimony on this issue.[35] During voir dire, several jurors expressed concern about what would happen to Ullery if he were acquitted by reason of insanity. Some jurors said they could not consider that verdict without knowing the answer. The trial court denied Ullery's request to explain the consequences of the verdict to the prospective jurors during voir dire.

■ ¶ 28 The trial court based its rulings on a belief that an instruction on the consequences of a not guilty by reason of insanity verdict is not permitted. This Court has held failure to give such an instruction was not error because the statutory mandatory commitment procedures are "merely a procedural statement of disposition subsequent to the verdict and [are] immaterial to the process of rendering a verdict concerning the sanity of the accused." [36] The United States Supreme Court held in *Shannon v. United States* [37] that federal law does not require this instruction. The Supreme Court analogized to the situation where the State fails to meet its burden of proof regarding guilt, noting there the system assumes a juror will vote to acquit even if the juror is convinced the defendant is dangerous and should be imprisoned.[38] We decline to revisit these decisions in this case. This proposition is denied.[39]

■ ¶ 29 Ullery claims in Proposition Ten that his rights to a fair trial and due process were fatally contaminated by a juror who lied during voir dire. Juror Morris stated she did not remember when the crime occurred, nor did she remember hearing or reading about it at the time, nor had she read the recent newspaper articles about the case. Ullery argues information he received after the verdict indicates Morris lied, cast-

---

35. Oklahoma law mandates that a defendant acquitted by reason of insanity must be committed to a state hospital for the mentally ill, where he shall be examined and treated; state psychiatrists must evaluate the defendant and report to the trial court; the defendant may not be released until the trial court determines he is not mentally ill and dangerous to the public peace or safety. 22 O.S.1991, § 1161. The defendant's hospitalization and treatment are for an indefinite period and the trial court may hold more than one hearing on the issue of release at the district attorney's request.

36. *Ellis v. State*, 1992 OK CR 45, 867 P.2d 1289, 1298, *cert. denied*, 513 U.S. 863, 115 S.Ct. 178, 130 L.Ed.2d 113 (1994), quoting *Thomsen v. State*, 1978 OK CR 80, 582 P.2d 829, 832. We have held failure to give this instruction was not error in: *Taylor v. State*, 1994 OK CR 61, 881 P.2d 755, 759; *Coggin v. State*, 1987 OK CR 243, 745 P.2d 1182, 1185; *Walker v. State*, 1986 OK CR 116, 723 P.2d 273, 284, *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600; *Nauni v. State*, 1983 OK CR 136, 670 P.2d 126, 134; *Boutwell v. State*, 1983 OK CR 17, 659 P.2d 322, 327; *Ragland v. State*, 1980 OK CR 90, 620 P.2d 418, 420.

37. 512 U.S. 573, 575, 114 S.Ct. 2419, 2422, 129 L.Ed.2d 459 (1994).

38. *Shannon*, 512 U.S. at 585, 114 S.Ct. at 2427. However, the Court earlier noted that defendants are generally entitled to instruction on lesser included offenses because of the "substantial risk that the jury's practice will diverge from theory." *Keeble v. United States*, 412 U.S. 205, 212, 93 S.Ct. 1993, 1998, 36 L.Ed.2d 844 (1973).

39. I disagree with my colleagues on this issue. I believe that under the circumstances of this case the trial court erred in refusing to either instruct the jurors on the consequences of a not guilty by reason of insanity verdict or allow defense counsel to informally explain the procedure to concerned jurors in voir dire. There is no guesswork involved in Oklahoma's law mandating commitment. The trial court and both parties knew exactly what would happen to Ullery under the statute. While the trial court was not required to allow testimony on this issue, nor to issue a general instruction, the trial court should have addressed jurors' obvious concerns and confusion on this issue.

ing doubt on her impartiality and imputing automatic bias. After the verdict Morris's son approached trial counsel. He eventually offered an affidavit stating he and Morris discussed the possibility of her sitting on this case when she was first called to the jury docket; he said Morris told him she had personal knowledge of the facts, had followed the case closely in the media over the last four years, thought the crime was horrible and would have no problem imposing the death penalty. This affidavit was admitted into the record for appeal purposes at sentencing, but counsel did not file any motions because there was not "enough time to sufficiently investigate" and verify the information.

¶ 30   Ullery now argues this Court should grant relief, on the grounds of juror bias, on the basis of this affidavit; in the alternative he requests an evidentiary hearing to determine possible bias. Ullery concedes this issue should have been raised in a motion for new trial based on juror misconduct or newly discovered evidence.[40] Such a motion should have been filed within one year after the judgment.[41] As Ullery failed to meet these requirements, this claim is barred.[42] We decline Ullery's suggestion to treat this proposition as a motion for new trial and remand for an evidentiary hearing.[43] This proposition is denied.

## ISSUES RELATING TO FIRST STAGE PROCEEDINGS

¶ 31   In Proposition Four Ullery argues that the evidence is insufficient to support the conviction for malice aforethought murder. Ullery admitted: (1) he intended to steal Neal's car; (2) killing Neal was an option he recognized before he left home; (3) he didn't plan to kill Neal but had thought about it; (4) he wore his knife in his boot when he went to Neal's house, just in case; (5) when neither Mace nor kicking stopped Neal from screaming he decided to stab her; (6) he knew she would be seriously injured, if not dead, from the stabbing; and (7) he stabbed Neal because he did not want her to get up and call police. The medical examiner testified Neal died of the combination of five stab wounds to the back of her neck and head. Malice, the deliberate intention to take the life of another without justification, may be formed in an instant.[44] Any rational trier of fact could find beyond a reasonable doubt that Ullery intended to kill Neal from this evidence.[45]

¶ 32   Ullery correctly argues that, in addition to the admissions above, he made conflicting statements regarding his intent in both confessions and presented a great deal of expert testimony indicating he was incapable of forming the intent to kill at the time of the stabbing. The resolution of conflicting evidence is left to the jury, and this Court will not disturb a jury verdict even where the evidence sharply conflicts.[46] We will accept all reasonable inferences and credibility choices tending to support the verdict.[47] If the jury rejected Ullery's insanity

40.   22 O.S.1991, § 952.

41.   22 O.S.1991, § 953.

42.   Rule 2.1(A), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (1999); *see also Dean v. State*, 1989 OK CR 40, 778 P.2d 476, 478; *Owens v. State*, 1985 OK CR 114, 706 P.2d 912, 913.

43.   Ullery cites *Allison v. State*, 1983 OK CR 169, 675 P.2d 142, 151. That case states one proposition of error is *in the form of a motion for new trial,* and the Court remanded for an evidentiary hearing on the issue of juror bias. We do not find this example sufficient reason to contravene the clear statutory and rule requirements necessary to raise this issue.

44.   *Powell v. State*, 1995 OK CR 37, 906 P.2d 765, 775, *cert. denied,* 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996).

45.   *Spuehler v. State*, 1985 OK CR 132, 709 P.2d 202, 203–04. Rather than argue that his confession was insufficiently corroborated by other evidence at trial, Ullery relies solely on it to argue that, taken as a whole, his statements were insufficient to show malice.

46.   *Rogers v. State*, 1995 OK CR 8, 890 P.2d 959, 969, *cert. denied,* 516 U.S. 919, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995).

47.   *Bryan v. State*, 1997 OK CR 15, 935 P.2d 338, 358, *cert. denied,* —— U.S. ——, 118 S.Ct. 383, 139 L.Ed.2d 299.

defense, sufficient evidence supports malice murder.[48] This proposition is denied.

¶ 33 Ullery claims in Proposition Five that the trial court erred in failing to give his requested instruction on the lesser included offense of depraved mind murder in the second degree. This Court has concluded that depraved mind murder is not a lesser included offense of malice murder, so the trial court did not err in failing to give the instruction.[49] Ullery recognizes these rulings but argues that, whether or not it is a lesser included offense, he was entitled to instruction on all degrees of homicide presented by the evidence.[50] The State fails to address this, instead arguing that Ullery was not entitled to instructions on any other form of homicide because the evidence here supported a finding of malice murder. As we have previously stated, the issue is not whether the evidence supports malice but whether in addition to evidence of intent there is also evidence that a defendant acted without design to effect death.[51] Here, there is no such evidence. No rational trier of fact could find from Ullery's statements, taken as a whole, that he had no design to effect death at the time he stabbed Neal. This proposition is denied.

¶ 34 Ullery argues in Proposition Six that the State failed to meet its burden of proving sanity beyond a reasonable doubt. Oklahoma law exempts from criminal responsibility those who, at the time of the crime, are incapable of knowing the wrongfulness of their act.[52] Criminal defendants are presumed sane. The defendant has the burden of raising a reasonable doubt of his sanity at the time of the crime.[53] "If the defendant establishes a reasonable doubt of his sanity, the presumption of sanity vanishes and it is incumbent upon the State to prove beyond a reasonable doubt that the defendant could distinguish between right and wrong at the time of the offense."[54] The jury determines whether the State has met this burden.[55] We recognize the general rule that, where any evidence tends to support the jury's finding that the State has met its burden, we will not disturb that finding on appeal.[56] After a thorough review of the evidence presented by both parties, we find that (1) Ullery raised a reasonable doubt as to his sanity, and (2) the State presented sufficient admissible evidence to prove Ullery was sane beyond a reasonable doubt at the time he stabbed Neal.

¶ 35 Neither party at trial seriously contested the fact Ullery was mentally ill. The issue was whether his mental illness so impaired his judgment that, at the time he killed Neal, he was incapable of appreciating the nature and consequences of his acts or knowing right from wrong.[57] Ullery present-

**48.** The State mistakenly argues that, in any event, Ullery's conviction must stand because sufficient evidence supports the alternative of felony murder. The State has misunderstood the well-settled law. In the absence of any underlying felony convictions, this Court will support a general verdict of murder only where sufficient evidence supports *both* alternatives charged. *See, e.g., McGregor,* 885 P.2d at 1376; *Crawford v. State,* 1992 OK CR 62, 840 P.2d 627, 639; *James v. State,* 1981 OK CR 145, 637 P.2d 862, 865–66.

**49.** *Welch v. State,* 1998 OK CR 54, 968 P.2d 1231, 1241; *Jackson v. State,* 1998 OK CR 39, 964 P.2d 875, 891, *cert. denied,* —— U.S. ——, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999); *Willingham v. State,* 1997 OK CR 62, 947 P.2d 1074, 1081–82, *cert. denied,* —— U.S. ——, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). We decline Ullery's suggestion to treat application of this rule as an *ex post facto* law.

**50.** *See, e.g., Tarter v. State,* 1961 OK CR 18, 359 P.2d 596, 601. We agree this is settled law and

not overruled, but note most of Ullery's cited cases discussed lesser included offenses.

**51.** *Le,* 947 P.2d at 546.

**52.** 21 O.S.1991, § 152.

**53.** *Cheney v. State,* 1995 OK CR 72, 909 P.2d 74, 85; *McGregor,* 885 P.2d at 1376.

**54.** *Cheney,* 909 P.2d at 85, quoting *Manous v. State,* 1987 OK CR 239, 745 P.2d 742, 744.

**55.** *McGregor,* 885 P.2d at 1376.

**56.** *Cheney,* 909 P.2d at 86; *Manous,* 745 P.2d at 745.

**57.** *Valdez v. State,* 1995 OK CR 18, 900 P.2d 363, 375, *cert. denied,* 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995); *Johnson v. State,* 1992 OK CR 71, 841 P.2d 595, 596; *Pugh v. State,* 1989 OK CR 70, 781 P.2d 843, 844.

ed a lengthy parade of witnesses. Friends, family and teachers testified regarding Ullery's childhood and adolescent disposition and his remarkable mental abilities demonstrated at the Oklahoma School of Science and Mathematics. All these witnesses described his rapid mental and behavioral decline which began during the fall semester of his senior year in high school. Ullery presented two medical experts: Dr. Bernhard, a psychologist who tested and treated Ullery in Colorado, and Dr. Smith, a psychiatrist who tested and treated Ullery in Oklahoma. Both these mental health professionals diagnosed Ullery with schizoaffective disorder, a brain disorder combining severe depression with psychotic symptoms. In exhaustive detail, both doctors described the nature of the illness, its apparent onset in Ullery, and its effects on his judgment and behavior. Both concluded Ullery's mental illness, specifically guided by the delusions and hallucinations, impaired Ullery's judgment and his ability to control his actions. To rebut this evidence the State presented one lay opinion on Ullery's mental state and circumstantial evidence. The State also argued that Ullery's statements after the crime (he knew his actions were wrong but wanted to get the death penalty) showed he was sane at the time of the crime. We discuss Officer Pearo's lay opinion in Proposition Seven, and find it was improperly admitted since he had no basis on which to form an impression of Ullery's mental state at the time of the killing. However, the remaining circumstantial evidence, taken with some of Ullery's statements to police officers, support the jury's determination that he was sane beyond a

reasonable doubt at the time he killed Neal. This proposition is denied.

¶ 36 In Proposition Seven Ullery argues improper injection of Detective Pearo's opinions about his mental health so infected the trial with unfairness as to deprive him of due process in violation of the United States and Oklahoma constitutions. For evidence that Ullery was sane at the time of the killing, the State relied on Detective Pearo's opinion, formed on March 26, that Ullery was in complete control of his mental faculties at the time he stabbed Neal on March 24. Ullery objected to this opinion at trial and has preserved the issue for appeal. Ullery correctly claims Pearo's opinion was inadmissible as lay or expert opinion testimony and should not have been admitted.[58] However, this error does not require relief. We have already determined that the State provided sufficient evidence that Ullery was sane beyond a reasonable doubt without this erroneous testimony. We conclude beyond a reasonable doubt that this error could not have contributed to the jury's verdict.[59]

¶ 37 Lay witnesses may testify as to opinions (1) rationally based on the witness's perception and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.[60] We do not agree that questions regarding Ullery's mental condition during the crime necessarily required a medical diagnosis. Where sanity is an issue, a lay witness may say whether he believes a defendant's actions, conduct and appearance is rational or irrational.[61] Admission of lay opinion evidence is within

---

58. Ullery and the State each argue the merits of Pearo's opinion as expert testimony. Pearo was never offered as an expert witness, his was unquestionably lay testimony, he never attempted to give a diagnosis or hold himself out as an expert, and we do not further address this sub-proposition.

59. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828.

60. 12 O.S.1991, § 2701; *Doyle v. State*, 1989 OK CR 85, 785 P.2d 317, 322 (sister could give opinion of sanity based on observation, but could not give medical diagnosis); *Kiser v. State*, 1989 OK CR 76, 782 P.2d 405, 410 (ex-wife's opinion regarding defendant's abnormal behavior and

anger based on observations made day before shooting); *Yates v. State*, 1985 OK CR 89, 703 P.2d 197, 199 (defendant's family opinion regarding sanity based on observations day previous to and weeks before murder). *See also* *McGregor*, 885 P.2d at 1374 (in competency proceedings, lay witness may testify as to observations made over time while defendant incarcerated); *Campbell v. State*, 1981 OK CR 136, 636 P.2d 352, 356, *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983) (in competency trial, defer to trial court finding that corrections officers' observations of defendant six months before hearing not too remote in time).

61. *Cheney*, 909 P.2d at 88.

the trial court's discretion.[62] However, that opinion must satisfy the statute's requirement of a rational basis from the witness's perception.[63] The cases cited by both parties, and used as authority here, all refer to opinions based on perceptions formed by observation before or at the time of the crimes. Neither party has directed us to any case in which this Court has allowed lay opinion on the issue of sanity where the witness was not present at the crime and did not meet the defendant until well after the crime occurred. Such is the case here.

¶ 38 Ullery stabbed Neal around 11:00 a.m. on March 24, 1993. Pearo met Ullery for the first and only time in the Adams County, Colorado jail around 5:30 p.m. on March 26, 1993. Pearo and Ullery spent about two hours together on the 26th. The State concedes this was not a significant amount of time, but argues it was sufficient for Pearo to form an opinion, based on his perception of Ullery at that time, which would aid the jury. The State is partially correct: that interview may have been long enough for Pearo to form a helpful opinion about Ullery's mental status *at the time of that interview*. That is all Pearo had the opportunity to perceive. That is not, however, the issue here. Pearo's brief contact with Ullery two days after the murder offers no basis whatsoever for him to have formed a perception of Ullery's mental state *at the time of the killing*. Pearo's opinion that Ullery was in control of his faculties at the time of the killing had no objective basis: he had never met Ullery, never observed him at any time before the crime, and had no opportunity to observe him until more than 48 hours after the crime was committed. This "opinion" could not possibly have aided the jury in determining the question of Ullery's sanity at the time of the crime. As it fails to meet either statutory requirement for the admissibility of lay opinion testimony, Pearo's opinion should not have been admitted. Ullery also claims the trial court erred in allowing the State to recall Pearo to repeat this opinion in rebuttal. As the opinion never should have been admitted at all, we do not reach this issue.

¶ 39 In Proposition Eight Ullery correctly argues the prosecution repeatedly misstated the law in first stage closing argument. The prosecutor argued that, the jury must convict Ullery of first degree murder even if it believed he was insane at the time he killed Neal. The prosecutor argued that no evidence suggested Ullery was insane when he initially assaulted Neal or stole her car.[64] Therefore, the prosecutor explained to the jury, even if Ullery was insane when he stabbed Neal he had to be guilty of felony murder because he was sane when he stole her car. The State cites no cases in support of this egregious misstatement of law. The Legislature has provided that all persons are capable of committing crimes, except insane persons "upon proof that at the time of committing the act charged against them they

---

**62.** *Allen v. State*, 1994 OK CR 13, 871 P.2d 79, 95, *cert. denied*, 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994) (victim's mother's opinion that defendant had dominant role in sexual relationship helpful to jury's determination of defendant as aggressor, motive for killing).

**63.** In affirming an Oklahoma Territory conviction for murder, the United States Supreme Court found no error in the trial court's failure to allow a lay witness to give an opinion as to the defendant's sanity. *Queenan v. Oklahoma*, 190 U.S. 548, 549, 23 S.Ct. 762, 763, 47 L.Ed. 1175 (1903). The Court noted the witness had testified regarding his observations of the defendant, his barber, before the murder, and stated, "to let a witness who is not an expert state an opinion upon sanity which he has formed after the event, when a case has arisen and become a matter of public discussion, must be justified, if at all, on other grounds."

**64.** This statement also misstated expert evidence. The prosecutor appeared to misunderstand the expert testimony. Both doctors said Ullery was suffering from delusions and mental illness which (a) caused him to both plan to steal a car and murder Neal and (b) prevented him from understanding the consequences of his acts or knowing right from wrong. Dr. Smith also determined Ullery suffered an isolated dissociative episode at the time of the stabbing. Despite Smith's repeated testimony that this determination was incidental to his finding of mental illness and did not play a part in his opinion that Ullery was insane at the time of the killing, the prosecutor argued Ullery suffered a dissociative episode only during the murder, not when stealing the car, and therefore could not have been insane during the robbery.

were incapable of knowing its wrongfulness."[65] Ullery was charged with "stabbing [Neal] with a knife" (1) with malice aforethought and the intent to effect death, or in the alternative, (2) while engaged in the commission of robbery with a dangerous weapon. Under either alternative, the "act charged" was stabbing Neal with a knife. Under either alternative, Ullery would be exempt from punishment if, at the time he stabbed Neal, he was incapable of knowing the wrongfulness of that act. To hold otherwise would eviscerate both § 152 and the availability of the insanity defense to a felony murder charge. It would also defy common sense. This Court declines the State's invitation to approve the suggestion that a person found insane for the purposes of criminal law may nevertheless be held responsible for committing a murder although he had no ability to understand that the act was wrong.

▮ ¶ 40 Ullery objected to this as a misstatement of law. The trial court neither sustained nor overruled the objection but admonished the jury that argument was not evidence. The jury was accurately instructed on the applicable law, and this admonishment cured the prejudice arising from this misstatement of law.[66] We will grant relief on a claim of prosecutorial misconduct "only where grossly improper and unwarranted argument affects the defendant's rights."[67] This argument neither affected a substantial right nor went to the foundation of Ullery's case, and did not contribute to Ullery's conviction.[68] This error does not require relief.

▮ ¶ 41 Ullery argues in Proposition Seventeen that his trial counsel failed to appropriately sum up his case for the jury. We address only his claim regarding first stage argument. In order to show ineffec-

tive assistance, Ullery must show that counsel's performance was so deficient he did not have counsel as guaranteed by the Sixth Amendment, and his defense was prejudiced as a result of counsel's deficient performance by errors so serious as to deprive him of a fair trial with reliable results.[69] There must be a reasonable probability that, absent errors, the sentencer would conclude the balance of aggravating and mitigating circumstances did not support a sentence of death.[70] Counsel must act as an advocate and subject the State's case to adversarial testing.[71] Ullery must overcome the strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance and equaled sound trial strategy.[72] This Court will consider whether, viewing counsel's challenged conduct on the facts of the case as seen at the time, it was professionally unreasonable; if so, we will ask whether the error affected the jury's judgment.[73] The question is not whether the outcome would have been different absent counsel's actions, but whether the result of the proceeding was fundamentally unfair or unreliable.[74] Ullery cannot meet this standard.

▮ ¶ 42 Taking several comments out of context, Ullery claims counsel downplayed the importance of evidence in first stage. Taken as a whole, both attorneys argued vigorously that Ullery was insane and should not be convicted of murder. Counsel reminded jurors both expert witnesses had testified Ullery had a severe mental illness and could not distinguish either right from wrong or that his acts were wrong when he killed Neal. Counsel did not use a timeline as a visual aid but painstakingly recited the chronology of Ullery's mental illness. Counsel

**65.** 21 O.S.1991, § 152.

**66.** *Hammon v. State*, 1995 OK CR 33, 898 P.2d 1287, 1307.

**67.** *Le*, 947 P.2d at 554.

**68.** 20 O.S.1991, § 3001.1.

**69.** *Hooper*, 947 P.2d at 1111; *Bryan*, 935 P.2d at 361; *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

**70.** *Bryan*, 935 P.2d at 361.

**71.** *United States v. Cronic*, 466 U.S. 648, 657, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984).

**72.** *Bryan*, 935 P.2d at 361–62; *LaFevers*, 897 P.2d at 306.

**73.** *Hooper*, 947 P.2d at 1111; *McGregor*, 885 P.2d at 1381.

**74.** *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993).

disparaged Officer Pearo's opinion about mental health evidence, submitting that both experts, plus Ullery's family and friends, believed that evidence should make a difference and that the jury should as well. Ullery claims counsel repeatedly referred to him as a monster, but actually counsel pleaded with the jury to remember his mental illness, go beyond appearances, and reject the State's implications that he was a freak or monster. The record does not support Ullery's claim counsel did not try to clarify the complex issues involved in his insanity defense. This proposition is denied.[75]

## ISSUES RELATING TO PUNISHMENT

■ ¶ 43 In Proposition Eleven Ullery argues the evidence was insufficient to support the heinous, atrocious, or cruel aggravating circumstance. As Ullery sprayed Mace in Neal's face she asked, "What are you doing? Why are you doing this?" She tried to run, then began screaming as Ullery grabbed her arm, dragged her into her house, and kicked her in the head. Neal continued to scream and tried to get up as Ullery stabbed her five times in the back of the neck, and he believed she was still trying to get up when he left. In addition to the stab wounds, Neal had blunt force injuries and abrasions, all made before death. Any rational trier of fact could find beyond a reasonable doubt that Neal's murder was preceded by serious physical abuse and conscious physical suffering.[76] This proposition is denied.

■ ¶ 44 In Proposition Twelve Ullery claims his death sentence violates the state and federal constitutions because mitigating factors outweighed evidence of aggravation introduced by the State. Ullery urges this Court to reweigh the evidence supporting the single aggravating circumstance and his evidence in mitigation. We consider this argu-

ment in conjunction with our mandatory sentence review.[77] We must first determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances. We determined in Proposition Eleven that sufficient evidence supports the heinous, atrocious, and cruel aggravating circumstance.

■ ¶ 45 In mitigation, Ullery presented evidence regarding his mental illness as well as evidence that he was not a disciplinary problem while incarcerated and had remorse for the crime. He had never been in trouble with the law. He incorporated the extensive first stage evidence of his extreme intelligence and early academic promise, onset of mental illness, rapid decline, and irreversible mental deterioration. This included information that, properly medicated, Ullery could continue to be a contributing member of society. Ullery testified on his own behalf. He apologized to Neal's family and the jury and expressed remorse. The jury was instructed that mitigating factors could include: (1) Ullery was mentally ill; (2) he was in a psychotic episode during the crime; (3) he has remorse; (4) he was 19 at the time of the crime; (5) he had no previous contact with law enforcement; (6) before his mental illness Ullery was an exceptional student with the potential for great achievement; (7) before his mental illness Ullery was warm and compassionate; (8) properly medicated Ullery poses no threat of violence and can be a productive member of society; (9) Ullery's mother has dedicated herself to understanding and treating mental illness; (10) his family will support and help Ullery cope and adjust to his circumstances; (11) Ullery had no discipline problems in jail.[78]

¶ 46 We have conducted a careful, independent review and considered the evidence supporting the aggravating circumstances, as

**75.** Ullery's Application for Evidentiary Hearing on Sixth Amendment Claims and Motion for New Trial Based on Newly Discovered Evidence, filed on October 26, 1998, is **DENIED.**

**76.** *Charm v. State,* 1996 OK CR 40, 924 P.2d 754, 770–71, *cert. denied,* 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997); *Cheney v. State,* 1995 OK CR 72, 909 P.2d 74, 80. We are

unpersuaded by Ullery's interesting argument that the level of violence was not gratuitous since it was intended to be in lieu of, rather than in addition to, Neal's death.

**77.** 21 O.S.1991, § 701.13(C).

**78.** Instruction 10.

well as the evidence offered in mitigation. We determine that under the specific facts of this case the mitigating evidence outweighs the evidence supporting the single aggravating circumstance. Accordingly, we modify Ullery's death sentence to life imprisonment without the possibility of parole. Ullery's other propositions concerning second stage issues are moot.

¶ 47 We find no error warranting reversal of the conviction. Accordingly, the Judgment for the crime of first degree murder in the District Court of Cleveland County is AFFIRMED. The Sentence is MODIFIED to LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE.

STRUBHAR, P.J., and JOHNSON, J., concur.

LUMPKIN, V.P.J., concur in results.

LILE, J., concurs in part/dissents in part.

LILE, Judge: concurs in part/dissents in part.

¶ 1 I agree that Appellant's conviction should be affirmed. I also believe that his sentence should be affirmed. All of the mitigating evidence was presented to the jury and I have great respect for their determination. The jury knew far more about Appellant than this Court can ever glean from a record. I would affirm the sentence of death.